STATE of Tennessee, Appellee,

v.

Leonard Edward SMITH, Appellant.

Supreme Court of Tennessee,
at Knoxville.

March 29, 1993.

Order Denying Rehearing
June 28, 1993.

J. Robert Boatright, Kingsport, Larry S. Weddington, Bristol, Michael J. Passino, Nashville, for appellant.

Charles W. Burson, Atty. Gen. & Reporter, C. Anthony Daughtrey, Asst. Atty. Gen., Nashville, Carl K. Kirkpatrick, Dist. Atty. Gen., H. Greeley Wells, Jr., Asst. Atty. Gen., Blountville, for appellee.

## OPINION

O'BRIEN, Justice.

This is the second trial for the defendant who has twice been indicted and convicted of murder in the first degree for the killing of Mrs. Novella Webb and each time has been sentenced to death by electrocution.[1]

The evidence shows that on 21 May 1984 defendant, his girlfriend, Angela O'Quinn, and David Wayne Hartsock were sitting in defendant's Ford Pinto automobile drinking and smoking marijuana when Hartsock and the defendant began plotting a robbery. After leaving O'Quinn, the two men drove

---

1. *See State v. Smith,* 755 S.W.2d 757 (Tenn. 1988).

to a country store in eastern Sullivan County operated by an elderly couple, W.H. and Novella Webb. Approximately 5:45 p.m. defendant and Hartsock entered the store, where Hartsock knocked down Mr. Webb and defendant fatally shot Mrs. Webb in the head when she tried to defend her husband by spraying the defendant with orange paint. There is no evidence of any struggle or physical contact between defendant and the victim.

Robert Glover, a customer, was standing on the front porch of the store and saw the two men enter. He heard the sound of two gunshots and started to enter the store. Defendant, from inside the store, told him he had better not come in if he knew what was good for him. Mr. Glover ran to the road and stopped a passing motorist, Charles Webb. Mr. Glover testified that the two young men ran from the store to their vehicle. He identified the defendant Smith at trial as one of the two who had entered the store.

Charles Webb, no relation to deceased, testified that he observed two unidentified young men run from the store, "hop in a car and take off." Another witness, Tommy Trivette, traveling behind Charles Webb, testified that he observed two young men walking slowly out of the store and that they "appeared to be smiling." He identified defendant Smith at trial as one of the two men he observed leaving the store.

After picking up O'Quinn, the defendant and Hartsock drove up into the nearby mountains, where they abandoned defendant's automobile after setting it afire. They then walked further into the woods where defendant and Hartsock cut off their hair and burned some of their clothes. The next day the three went to the home of Gladys Sheets, who drove them to a discount store and food market in Johnson City, where Sheets and O'Quinn bought camping supplies and food with money supplied by the defendant.

Because it could implicate him in the crime, defendant had Hartsock throw his gun out of the car window as they drove across the bridge over a railroad track on the road between Johnson City and Eliza-bethton. Sheriff officers later found the gun, a .32 caliber revolver, sprinkled with orange paint. The composition of two bullets in the gun matched that of an unspent bullet in defendant's possession and the slug taken from Novella Webb's body. Two days after the offense occurred authorities arrested the defendant, O'Quinn and Hartsock at an unoccupied farm house in Johnson County. Defendant confessed to shooting Mrs. Webb but claimed that the gun had gone off accidentally while he and Mrs. Webb were struggling.

Defendant has presented 24 issues for review which we will endeavor to address in chronological sequence in accordance with the trial proceedings.

 Defendant first says the denial of a motion for change of venue violated his rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sec. 8, 9 and 17 of the Tennessee Constitution. Defendant's trial was originally set in Sullivan County where the offense occurred for which he was indicted. The trial court, apparently due to pretrial publicity, moved the trial from Sullivan County to Hamblen County, with defendant's consent. The co-defendant, Hartsock, had two trials in that jurisdiction, one for the homicide of John Pierce, and the other involving the murder and robbery of Novella Webb. Smith was also previously tried in both cases. His conviction in the Webb case was set aside by this court for trial error. It is argued that denial of a motion for a change of venue from Hamblen County after three trials on the same set of facts violated defendant's rights under the State and Federal Constitutions. The proof does not support this contention. Ten of the 50 prospective jurors had heard of the case, but with a few exceptions their knowledge was only cursory. There is absolutely no proof of any undue excitement against the defendant because of the prior trials. Defendant says that of the first 12 jurors seated in the jury box four (4) of them indicated they had read or heard something about the case. Of those four (4), he only mentions two (2) by name, neither of whom sat

on the jury which heard the case. Defendant does not say that he exhausted his peremptory challenges, however it is argued that the publicity in this case requires application of the "presumed prejudice" standard followed by the United States Supreme Court in *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); and *Shepherd v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Those cases involved extremely inflammatory publicity and media conduct creating a corruptive carnival atmosphere that deprived the proceedings of the "solemnity and sobriety" required for due process. They do not stand for the proposition that juror exposure to information about the crime and the defendant's prior convictions, which was primarily the type of publicity in the present case, is presumably prejudicial. *See State v. Bates*, 804 S.W.2d 868 (Tenn. 1991); cert. denied —— U.S. ——, 112 S.Ct. 131, 116 L.Ed.2d 98 (1991). In *State v. Melson*, 638 S.W.2d 342, 360–361 (Tenn. 1982), this Court reiterated the rule which applies in cases of this nature, that is, the decision of whether or not to change the venue is for the sound discretion of the trial court and may not be reversed on appeal absent a clear abuse of such discretion. There was no such abuse in this case.

■ Defendant charges the trial court with error in allowing testimony that described the victim as lying in a pool of blood an inch deep, arguing that this testimony was irrelevant, inflammatory and highly prejudicial. We note, first of all, that this is not a correct summation of the evidence. Sheriff Keith Carr testified on direct examination that when he arrived on the scene both Mr. and Mrs. Webb had been taken to the hospital. He described the scene as "a small country store in disarray, a lot of blood, things moved around. At the end of the counter ... there was a pooling of coagulated blood and just general disarray." Upon further inquiry he explained his intent to sift through the blood to search for a bullet that may have exited the body. Prior to sifting through the blood he measured its depth with a yardstick and found it to be about an inch deep. An objection to this testimony was overruled on the basis that the witness could describe the scene as he found it. Subsequent witnesses described the scene as they observed it immediately after the shooting. Robert Glover testified that "Mrs. Webb was laying on the inside right there next to the heater like in a pool of blood everywhere where he had shot her and killed her." Charles Webb, who was almost immediately on the scene said, "I looked and she was laying in the floor, you know, in behind the counter so I had to walk up to the end of the counter to see her and she was laying there just face down you might as well say, in a pool of blood." A third witness immediately on the scene, Tommy Trivette, said as he went in the store, "Mr. Webb said, 'I've been robbed,' and I just said, are you alright? And he looked at me for a couple of seconds and said, 'they shot my wife.' So I looked over the counter and seen his wife laying there. I went around to see if I could help her out any and she was laying in a puddle of blood, kind of face down, so I rolled her over to get her to where she could breathe." The only objection made to any of this testimony was that which was made to the statement by Sheriff Carr. The statement of the other witnesses was voluntary and unsolicited by the State attorney. In *State v. Banks*, 564 S.W.2d 947 (Tenn.1978), this Court adopted Federal Rule of Evidence 403 applying to the admission of relevant evidence. The rule provides:

> "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

In the explanatory note to Rule 403, "unfair prejudice" is defined by the advisory committee as: "An undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." See *Banks* at 951.

None of the testimony complained of reached this level of prejudice. Its probative value was essential to the State's case and was not in any manner gruesome or inflammatory. The issue is overruled.

Defendant says the trial court erred in allowing admission of certain evidence introduced to prove intent to commit robbery in violation of various of his constitutional rights. This complaint is divided into a number of sub-issues the first of which involves a statement given by him to the police. He says the trial court should have suppressed this statement because it was coerced. He cites the transcript of the record of his previous trial to sustain this issue. This Court considered and rejected defendant's argument that his statement was coerced at that trial at 755 S.W.2d, at pp. 762–763:

> The defendant contends that his confession was coerced from him and was given involuntarily and thus in violation of his constitutional right of due process. Sheriff Mike Gardner and Detective Keith Carr testified in considerable detail concerning the circumstances surrounding the defendant's confession and the trial judge, after considering the evidence offered by the State and by the defendant upon this issue, resolved the issue in favor of the State and admitted the confession into evidence. This Court is bound by that determination if there be any material evidence to support it. *State v. Pritchett*, Tenn., 621 S.W.2d 127 (1981); *State v. Chandler*, Tenn., 547 S.W.2d 918, 922–23 (1977). We find ample evidence in this record to support the finding of the trial court that the defendant's confession was given voluntarily. ..., Sheriff Mike Gardner testified at a hearing on the motion to suppress that on May 23, 1984, the defendant was arrested outside a house in a remote area of Johnson County, pursuant to an outstanding arrest warrant. Defendant was seized when he and two companions emerged from the house, handcuffed, independently advised of his rights, and placed in a patrol car. The defendant made no statement to the sheriff or any other officer before being advised of his rights. Upon arriving at the Sullivan County Jail, the defendant was re-advised of his rights. After the defendant gave a written statement, Sheriff Gardner asked him if he had read a printed form advising him of his rights under the *Miranda* decision and, if so, whether he had made the statement which he had signed and whether or not it was an accurate statement; to all of these inquiries the defendant answered affirmatively. Sheriff Gardner denied that he or any of his deputies physically or verbally mistreated the defendant, as he alleges.

> Detective Keith Carr testified that before the interrogation of the defendant at the jail, the defendant was advised of his *Miranda* rights and stated that he understood them. He stated his willingness to waive his rights and signed a written form of waiver at 9:20 a.m. After Carr wrote down defendant's statement, the defendant read it aloud, verified its accuracy and initialed each page and signed it. During the course of the day the defendant was interviewed about other matters and was re-advised of his rights each time. At 10:55 a.m. the defendant refused to answer any questions and at that time all questioning ceased. Detective Carr testified that the defendant was neither physically nor verbally abused but was given coffee and cigarettes, but did not ask for food. Detective Carr testified that the defendant complained to him that his back was hurting because an arresting officer had put a gun to his back, whereupon Carr examined defendant's back and saw a red spot but no laceration. Defendant also complained about paralysis of his right hand but Detective Carr, who was also a qualified emergency medical technician, saw the defendant sign the statement with his right hand without difficulty and saw no swelling or bruising. The defendant did not ask to see a physician, or a nurse, for medical treatment. Carr testified that the defendant was alert and gave immediate responses to all questions and that the defendant did not ask for an attorney.

Gerald Meredith, a nurse employed by the sheriff's department, testified that he examined the defendant approximately fifteen minutes after the defendant arrived at the jail and observed only two small areas on the defendant's back and testified that these appeared to be a couple of days old.

Our conclusion is that the evidence just outlined amply supported the conclusion of the trial court that the defendant's confession was voluntarily given and was admissible in evidence.

Defendant has presented no new evidence on this issue at this trial. The issue is without merit.

Defendant asserts that the trial court improperly redacted his statement by failing to delete a reference to the Pierce robbery. It is argued that in order to prove first degree felony murder, the State had to prove as an element of the crime that the killing took place during the perpetration of a robbery and that the trial court redacted the statement with the express purpose of showing intent to rob Webb Store by retaining Hartsock's remark, "I can get us a little bit of money down here at this store," in which "this store" originally referred only to Malone's Market, where Pierce was killed.

On the first appeal, this Court held that the trial court had erred in denying defendant's motion for a severance of the Pierce and Webb murder cases. The Court held that evidence of the Pierce robbery and murder was inadmissible at the Webb trial because it was not relevant to any issue on trial in the Webb murder and even if it had some remote relevance to the question of whether or not the defendant entered the Webb grocery with intent to commit robbery, its probative value as such evidence was far outweighed by its prejudicial effect upon the defendant in the Webb case under the rule established in *State v. Parton*, 694 S.W.2d 299, 302–303 (Tenn.1985), and *Bunch v. State*, 605 S.W.2d 227, 229–230 (Tenn.1980). The Court concluded that the defendant's confession could be easily redacted by deleting any reference therein to the robbery and killing of Mr. Pierce, say-ing, contrary to the insistence of the State, even after the redaction the record contained evidence that the defendant entered the Webb grocery with intent to commit robbery.

■ At this trial the trial judge deleted all reference to the Pierce case from the defendant's statement with the exception of one sentence attributed to the co-defendant in which Smith said, "he and I got out and walked aways back from the car where Angie couldn't hear us talking and David said I can get us a little bit of money down here at this store." In overruling the motion to strike the trial judge made the following comments:

"... You're saying that that referred to another store. Well, actually it did but its the only statement in the statement that—and it doesn't say which store, of course, but its the only statement in the statement that indicates a preexisting plan to rob a store. Now, as redacted the statement doesn't refer to which store. The first store, it was bungled and a man was killed there, of course, and so there was a—I believe that based on subsequent events, it indicates a—its a continuing intent to get money from a store. And the Supreme Court has said that the statement can be redacted so as to show an intent to rob, and that's the only statement in it that shows an intent to rob. I assume and I must assume from the Supreme Court opinion and the reading of the statement that that is what they have reference to, and I would overrule your motion based on that."

If the denial of the motion to strike was error, and we are not convinced that it was, we do not find that its probative value is outweighed by the danger of unfair prejudice to the defendant. Defendant's statement is replete with other references to an intent to rob the Webb store. Defendant, in his statement, first says he pulled in at Webb's store to turn. He stopped the car, Hartsock jumped out and Smith ran in the store behind him. The next sentence infers robbery when Hartsock jumped on the counter, knocked Mr. Webb over and yelled to him (Smith) to "get that bitch," referring

to an old woman at the end of the counter. Defendant says he started toward her and fired one shot just to scare people. Hardly any other implication could be drawn than that the duo were bent on the felony of robbery. The statement "I didn't get any money and David didn't say if he did or not," clearly expresses the intent to rob. The fact that defendant entered the store building armed and Mrs. Webb was shot within a few seconds thereafter, is indicative of an attempt to perpetrate a robbery.

■ Defendant complains of what is referred to as testimony of witness Tommy Trivette to hearsay statements made by Worley Webb. It is plain from the evidence that witnesses, Robert Glover, Charlie Webb, and Tommy Trivette were in the store almost simultaneously, within seconds after the shooting. Trivette testified that when he entered the store Mr. Webb said, "I've been robbed," and looked at him for a couple of seconds and said, "they shot my wife." This was obviously an excited utterance exception to the hearsay rule. Defendant says the exception should not apply because Mr. Trivette was not the first person to talk to Mr. Webb after the event. That may or may not be true. Another witness, Charlie Webb, says when he went in the store he asked Worley Webb if he was hurt and received the reply, "no, but I think she is." Nonetheless, the definition stated by defendant is not the correct criterion. This Court has recently adopted Tennessee Rules of Evidence which were the product of several years of study and research. Rule 803(2) defines an "excited utterance" as a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition. It is generally a restatement of existing Tennessee law. The ultimate test is spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement and strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication. *See Garrison v. State*, 163 Tenn. 108, 116, 40 S.W.2d 1009, 1011 (1931); Paine, Tennessee Law of Evidence, (1974), Part F. Excited utterance, § 69. In *Management Services v. Helman*, 40 Tenn.App. 127, 289 S.W.2d 711 (1955), the Court of Appeals cited extensive authority for the rule that an excited utterance should not be excluded because it was elicited by another, who made inquiry of him. While these earlier cases applied the rule to the concept of res gestae, since the adoption of Rule 803(2) we consider it appropriate to apply it, as stated here, to an excited utterance declaration. *See State v. Carpenter*, 773 S.W.2d 1, 9 (Tenn.Cr.App. 1989).

■ Defendant's objection to the testimony of Katie Webb Mahoney, daughter of Worley and Novella Webb, was appropriate in the sense that the direct examination of the witness had very little if any probative value in reference to the circumstances of the case. Of course, the State was endeavoring to show that a robbery had occurred and defendant is correct in stating that this witness had no knowledge of that event. However, every relevant objection that was made was sustained by the trial judge. He gave numerous cautionary instructions to the jury in conjunction with the objections made. Much of the State's examination related to background evidence about the Webb's and at the most, such error as occurred was totally harmless.

■ Defendant argues that the evidence of intent to commit robbery was insufficient to sustain a conviction for felony murder. The critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be to determine whether the evidence of record could reasonably support a finding of guilt beyond a reasonable doubt. The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The evidence presented at trial in this case, viewed in the light most favorable to the State, is sufficient to establish to a rational trier of fact beyond a

reasonable doubt that the defendant entered the Webb grocery intending to commit the felony of robbery. The issue is overruled.

Defendant complains that it was error to admit a photograph of an indentation in the wall of Webb's grocery. The State's theory was that the indentation which appeared fresh, had been made by the second, "lost" bullet. The exhibit illustrates that the indentation had apparently been recently made but nothing more. On the appeal of the first trial this Court found that no prejudice could have resulted from admission of this photograph and that any error was harmless beyond a reasonable doubt. *State v. Smith, supra,* 755 S.W.2d at p. 765. This holding is valid as to the second trial and we find no merit to this issue.

■ Defendant says it was prejudicial error for the trial court to deny a motion to limit aggravating circumstances and allow the State to introduce evidence of his conviction and sentence for first degree murder in the first case at the sentencing phase of his trial. He argues that he was not directly involved in any threat or act of violence against the victim and as a result of introducing his conviction *and sentence* in that case, the prosecution made it known to the jury that he had received a life sentence. As a result he says the State effectively eliminated the option of life imprisonment as a sentence in this case. It is his insistence that T.C.A. § 39–2–203(i)(2) should be limited to convictions where a defendant has directly used threats or violence against another person.[2] He states correctly that the record shows that he was not in Malone's grocery when John Pierce, the storekeeper, was shot and he never came into contact with that victim. He cites a Florida case, *Lewis v. State,* 398 So.2d 432 (Fla.1981), to sustain his argument. This Court has not construed the statute in question in this manner. The clear language of the statute does not require such limitation. In *State v. Teague,* 680 S.W.2d 785, 789 (Tenn.1984), this Court

held that it made no difference that the defendant did not fire the shot that killed a victim in a prior felony. We are of the opinion that the degree of a defendant's involvement in an aggravated felony goes to the weight the jury is to give aggravating circumstances when determining whether they outweigh mitigating circumstances.

■ Defendant next poses the issue, that precluding the jury from hearing evidence or receiving instructions regarding the meaning of a life sentence, consecutive and concurrent sentencing, or parole eligibility violates his constitutional rights. At the sentencing hearing, a short time after the jury retired to consider their verdict, the jury dispatched the following note to the trial judge:

(1) Define life sentence;

(2) Define consecutive and concurrent life terms and which would apply if a second life sentence was given;

(3) When would parole apply.

The trial court instructed the jury, "The Court is not permitted to respond to your questions. Please retire and resume your deliberations." Defendant raises several points on the Court's refusal to instruct on the matters raised by the jury as violation of his federal and state constitutional rights as follows:

(1) By not allowing defendant to rebut issues and evidence of parole raised by the State.

(2) By precluding admission of a mitigating factor.

(3) By raising a non-statutory aggravating factor of "future dangerousness."

(4) By violating Article 1, § 19 of the Tennessee Constitution.

There is no validity to defendant's argument that the failure of the trial judge to answer the jury's question somehow precluded his rebuttal of any evidence of parole which might be introduced by the State. This is equally true of the argument that information regarding parole eli-

---

2. T.C.A. § 39–2–203(i)(2) [now § 39–13–204(i)(2)], provides: That the defendant was previously convicted of one or more felonies, other than the present charge, which involved the use of threat of violence to the person.

gibility and consecutive and concurrent sentencing may operate as mitigating evidence, and that the failure of the trial judge to respond could create the possibility that the jury could engage in speculation which would harm defendant's interests. It is insisted the judge's response to the inquiry from the jury was inappropriate because keeping this information from the jury somehow creates a non-statutory aggravating factor of future dangerousness.

Defendant mistakenly cites from our recent opinion in *State v. Bates, supra*, to support his reliance on mitigating evidence of mental disturbance and potential for rehabilitation as an arm of his defense. It is as much in the public interest, as a counter to such a defense, for the jury to consider evidence of possible future dangerousness of a particular defendant. In *Bates*, 804 S.W.2d at p. 881–82, we said:

> ... The United states Constitution does not preclude a capital sentencing jury from considering the future dangerousness of a particular defendant where such is a relevant factor under a State's law of capital sentencing. See *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *California v. Ramos*, 463 U.S. 992 [1000–01], 103 S.Ct. 3446, 3453, 77 L.Ed.2d 1171 (1983); *Spaziano v. Florida*, 468 U.S. 447 [461–63], 104 S.Ct. 3154, 3163, 82 L.Ed.2d 340 (1984).

The defendant lifts part of a sentence from Article 1, § 19 of the Tennessee Constitution to argue that a rule which prohibits the jury in a capital sentencing hearing from being instructed on parole eligibility and consecutive and concurrent sentencing violates Article 1, § 19. That portion of the constitutional article which defendant relies on applies to indictments for libel and does not touch the facts of this case top, side, or bottom. The introduction of such instructions creates the possibility of jury speculation on the length of time a convicted defendant would be required to serve and further tends to breed irresponsibility on the part of jurors premised upon the proposition that corrective action can be taken by others at a later date. A greater defect in such instructions stems from the fact that jurors tend to attempt to compensate for future clemency by imposing harsher sentences, which is certainly a matter of prejudice to a defendant.

■■■ Neither the Tennessee Constitution nor the Federal Constitution prohibits or requires informing a capital sentencing jury of relevant and accurate sentencing information. *See State v. Bates, supra; California v. Ramos, supra.* We are of the opinion that to provide a jury with the sort of information requested by defendant could result in sentences of death based on sheer speculation and on factors other than those enumerated in T.C.A. § 39–2–203 and sanctioned under either Constitution. *See Graham v. State*, 202 Tenn. 423, 304 S.W.2d 622, 624 (Tenn.1957).

■■■ Defendant complains the trial court refused to grant *ex parte* hearings pursuant to T.C.A. § 40–14–207(b). Defendant says that off the record, in chambers, as later acknowledged by the trial court, the trial judge stated he would not entertain any motions regarding expert services for the defense without the district attorney present. There is no such comment at that point in the record. The trial judge remarked that he had given permission to hire every expert that defense counsel had asked for. Defense counsel agreed, saying "I don't think there is any question about that." There was no prejudice to the defendant in the process employed by the judge to provide defendant with such expert assistance as was needed. Apparently he required motions to be filed with affidavits stating the necessity for these experts. Defense counsel's only complaint was that they were required to provide the State with a copy of the motion and they were of the opinion they ought to be able to hire experts without the State having initial access to what they were to be used for. The statute in question does say that in capital cases, where the defendant has been found to be indigent, the court having jurisdiction of the case, in an *ex parte* hearing, *may* in its discretion determine the need for investigative or expert services or other similar services, to insure that the constitutional

rights of the defendant are properly protected. The statute does not require any particular form for an *ex parte* hearing. The defendant might, if he fears divulging some area of his defense, ask for an in camera examination of that particular bit of evidence. Defendant has not shown he was compelled to divulge confidential matters. The denial of an *ex parte* hearing did not comply with the mandate of the statute, but even though erroneous, seems to implicate only statutory rights and the trial court's failure to follow the statute appears to be non-prejudicial and harmless error in any event. Defendant's constitutional right was to the services prescribed in the statute, not in the process by which they were provided. Defendant has not shown that he was forced to disclose any information protected under Tenn.R.Crim.P. 16(b)(2) or any information that, in substance, would not have eventually been produced by the State through discovery or under Tenn.R.Crim.P. 26.2. Moreover, this was the second trial of this case and the State was certainly familiar with defendant's theory of defense.

Defendant complains too of the statutory requirement for reciprocal discovery claiming that compliance with Court rules denied his rights to due process and equal protection because of his indigency. Tenn. R.Crim.P. 16 requires disclosure from the most monied defendant, as well as the poor. A criminal trial is a search for the truth as it pertains to a defendant's innocence or guilt. The rules providing for mutual discovery and for protection of a defendant from disclosure of internal defense documents made in connection with the investigation or defense of the case accrue to the benefit of the most destitute with equal force as they do to the benefit of the wealthy. Defendant's complaint warrants no further discussion.

■ Defendant's charge that the trial court refused to authorize compensation for the defense to retain Dr. David Bear is equally without merit. Defendant has not designated the place in the record where the Court expressly declined to appoint Dr. Bear as a defense expert. We must assume the reference is to page 39–40 of the transcript where the Court declined to appoint a defense specialist, as opposed to a medical or psychiatric specialist. Apparently defendant wanted Dr. Bear as an expert to explain to the jury, from a medical standpoint, the significance of Magnetic Resonance Imaging and Electroencephalogram results in the context of the findings from the neuropsychological test, clinical interview and social and medical history. Two experts were appointed by the court to conduct and evaluate an MRI and EEG examinations of the defendant. Defendant's argument notwithstanding, neither T.C.A. § 40–14–207(b) nor *Ake v. Oklahoma*, 470 U.S. 68, 84–6, 105 S.Ct. 1087, 1097, 84 L.Ed.2d 53 (1985), require that a defendant have an expert of his choice appointed. The constitution requires that an indigent defendant be provided with the tools necessary to present an adequate defense. Having been provided with those implements of defense he is entitled to no more.

■ Defendant raises prosecutorial misconduct as a violation of his constitutional rights and cites several instances as reversible conduct. He charges the State's attorney, without any basis of fact in the record, with expressing personal opinions about the credibility of a defense witness and attacking that witnesses integrity. This reference is to the purported attack on the integrity of an expert witness, Dr. Pamela Auble. The State argued that the manner in which Dr. Auble testified and her explanations of what she had said in a prior affidavit showed bias. Defendant did not object to these remarks, nor to an earlier statement suggesting that Dr. Auble was trying to influence the jury to not put defendant in the electric chair. We have read the record and considered the argument of State's counsel which defendant says was intended to mislead the jury. We do not find that argument to reach the heights of impropriety suggested by defendant. In *State v. Russell*, 532 S.W.2d 268 (Tenn.1976), cited by defendant, the Court found the argument of the District Attorney General to have gone beyond the pale of legitimate argument, raising the spectre

of conspiracy, deceit and worse, on the part of psychiatrists, psychologists and attorneys. While the State's attorney in this case bore down on the testimony of Dr. Auble, his argument did not approach the tenor of the argument in *Russell.* The State's attorney was entitled to argue the reasonable inferences raised by the evidence adduced at trial and we find his argument did not exceed that point.

■ Defendant says the prosecution argued deterrence and disregarded the trial court's explicit order. The trial judge did, indeed, point out to counsel prior to argument that deterrence was not proper evidence for either the State or the defendant to mention in argument. In this case defense counsel isolated two remarks by the District Attorney General in argument which he describes as "a thinly-veiled reference to deterrence," and cites them as reversible error. We do not find either of the comments made by the State's attorney to have affected the judgment in this case. For the benefit of both State and defense counsel we can do no better than reiterate our admonition in *State v. Irick,* 762 S.W.2d 121, 131 (Tenn.1988); cert. denied 489 U.S. 1072, 109 S.Ct. 1357, 103 L.Ed.2d 825 (1989):

> "Unquestionably, any argument based on general deterrence to others has no application to either aggravating or mitigating circumstances. Argument of this nature is inappropriate at a sentencing hearing. Deterrence of defendant at trial by imposition of the death penalty is obvious and it would seem, redundant. Debatably, at least that part of the State's argument directed specifically toward deterrence of the defendant is made in rebuttal to argument by defense counsel. The thrust of the defense argument was the suitability of a life sentence over execution of the defendant under the circumstances of the case. A court reviewing the propriety of argument in a capital sentencing proceeding must determine whether the prosecutor's comments affected the sentencing decision. If the Court cannot say the comments had no affect on the sentencing, then the jury's decision does not meet the standard of reliability required by the Eighth Amendment. Both parties strayed from the path directed by the trial judge, not by direct reference to deterrence or lack thereof, but by implication. One would have to strain to consider the State's argument to be violative of defendant's constitutional rights."

The same is true of the defense complaint about the State's cross-examination of Dr. Auble raising the issue of parole. On direct examination defense counsel asked Dr. Auble if she could explain why defendant pulled the trigger on a gun that caused the death of the robbery victim. She responded that his judgment and reasoning were limited because of brain damage, his intelligence was low and the actions of the robbery victim was too much for his brain. On cross-examination the District Attorney posed a question based on her affirmative response to the last made inquiry by defense counsel. When she responded to the State's question it was then asked "[I]f Leonard Smith gets back on the street he is very likely to repeat that same type of activity with those same results, is he not?" Objection was made to the form of the question. At a bench conference defense counsel explained his objection to the question to be that it was a reference to life imprisonment without parole. After some discussion it became plain that the attorney general was endeavoring to impeach the witness on the basis of a report she had submitted in connection with an affidavit she had previously made in the case. In the report she had stated that defendant had been diagnosed in the past on two occasions by two different people as an anti-social personality. The trial court admonished the attorney general to restate his question and he was allowed to proceed. There was no curative instruction requested. The record simply does not support defendant's contention that the State deliberately injected the issue of parole into his cross-examination. His continued cross-examination clearly demonstrates his intent was to impeach defendant's expert witness. We find the objection to be unsustainable.

Defense counsel were highly alert in raising objections to cross-examination and argument when they considered it appropriate. Such an objection was made when the attorney general began reading from a United States Supreme Court case in support of his argument that punishment be commensurate to the offense committed. The objection was made on the proposition that the argument was getting outside the evidence and talking about deterrence. It was sustained. The defense now says that the prosecutor's remarks were intended to rouse the jury's ire and emotions. The trial judge referred to it as an isolated statement in a court case. The attorney general's reference was not extensive nor was it a misleading use of a passage from a judicial opinion. We do not find it a violation of defendant's constitutional rights.

■ Defendant says the prosecutor intentionally mislead the jury as to inferences to be drawn from the evidence. The District Attorney General argued that the defendant may have killed Mrs. Webb because she had known him all his life and could have identified him. No trial objection was made to this argument. This was a legitimate inference to be made from the proof and was permissible to rebut defendant's contention that the shooting was accidental. The issue is without merit.

On the premise that the prosecution intentionally misstated and misrepresented defendant's mitigating evidence and the legal standard for considering that evidence, defendant makes a general attack on portions of the State's argument intended to rebut the mitigating evidence. We find no indication of any such intentional misstatement or misrepresentation. This was a hard fought case in which both sides urgently and diligently endeavored to impress upon the jury the merits of their case. When either side exceeded the bounds of proper argument, on appropriate objection, the trial judge promptly and firmly responded. We do not think the jury was mislead in any manner.

■ The defendant has raised two separate issues questioning the presentation of victim impact information in the form of testimony and argument. He relies on *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and *South Carolina v. Gathers*, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989). In *State v. Payne*, 791 S.W.2d 10, 19 (Tenn. 1990), this Court said, "It is an affront to the civilized members of the human race to say that in sentencing in a capital case, a parade of witnesses may praise the background, character and good deeds of Defendant (as was done in this case), without limitation as to relevancy, but nothing may be said that bears upon the character of, or the harm imposed, upon the victims." The Court found that if error existed, it was subject to harmless error analysis and found the issue to be without merit. On appeal, the United States Supreme Court overruled both *Booth v. Maryland* and *South Carolina v. Gathers*, holding that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar. "A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to a jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated." *Payne v. Tennessee*, 501 U.S. ——, ——, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991). In the process the Court reaffirmed the view expressed by Justice Cordoza in *Snyder v. Massachusetts*, 291 U.S. 97, 122, 54 S.Ct. 330, 338, 78 L.Ed. 674 (1934): "Justice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true."

Defendant earnestly argues that the trial court's refusal to give his requested instructions on non-statutory mitigating circumstances violated his constitutional rights by preventing the jury from considering and giving effect to his mitigating evidence. Defendant cites no valid authority for this argument and the law is to the

contrary. This Court has held that only those mitigating circumstances raised by the evidence should be charged, *State v. Buck,* 670 S.W.2d 600, 608 (Tenn.1984), but in the absence of a showing of prejudice, this error would generally benefit the defendant and does not require reversal. In *State v. Hartman,* 703 S.W.2d 106, 118 (Tenn.1985) the Court said:

"Assuming, without deciding, that there were non-statutory mitigating circumstances raised by the evidence, we find no provision in the death penalty statutes requiring that such factors be expressly charged. The only thing in the statutes relative to defendant's contention under discussion is that mitigating circumstances are not limited to those expressly listed therein. T.C.A. § 39–2–203(j). Accordingly, we have held that the jury may consider any non-statutory mitigating circumstances, on its own initiative, and that there is no requirement that they reveal in their verdict what mitigating circumstances, if any, were considered. *State v. Melson,* 638 S.W.2d 342, 368 (Tenn.1982). Therefore, we hold that the only mandatory instructions with respect to mitigating circumstances are that those statutory circumstances which are raised by the evidence shall be expressly charged, and the jury must be told that they shall weigh and consider any other facts or circumstances that are raised by the evidence that they find to be mitigating circumstances, in making the determination of which circumstances, aggravating or mitigating, outweigh the other."

The trial judge correctly refused to deliver defendant's proposed instructions on non-statutory mitigating factors because of the form in which they were submitted. Some of it was repetition of his prepared instructions, some was couched in inappropriate language. He included that part of the proffered instructions which he considered appropriate in the charge delivered to the jury. In addition to the circumstance that there was no constitutional violation, there was no error in denying the instructions submitted to the court.

Defendant charges prejudice because the State argued the applicability of each statutory mitigating circumstance. He says that by instructing all mitigating circumstances and submitting only statutory circumstances to the jury in writing created prejudice because, coupled with the State's aggressive exploitation of instructional ambiguities the jury was mislead to believe the statutory circumstances were the "important" ones which the defendant should prove, thus leaving the jury with no guidance in "sorting out" the defendant's evidence.

In reference to the instructions on mitigating circumstances delivered to the jury the trial judge informed them, "in arriving at the punishment the jury shall consider, as heretofore indicated, any mitigating circumstances which shall include, but not be limited to the following." He then listed the eight (8) mitigating circumstances contained in T.C.A. § 39–2–203(j). He continued, "because different people may have different views about what tends to mitigate any particular offense, the law provides that you may weigh and consider any and all facts and circumstances about the offense, the defendant, and the case, which the defendant proffers as a basis for a sentence less than death, or which you believe to be mitigating circumstances or circumstance. You are in no way limited to listed mitigating circumstances and you should consider any other mitigating facts or circumstances. The law does not require you to list or specify what mitigating circumstances you find, weigh or consider. Mitigating circumstances or any facts relating to defendant's age, character, education, environment, mentality, life and background or any aspect of the crime itself which may be considered extenuating or reducing his moral culpability or making him less deserving of the punishment of death. You may consider as a mitigating circumstance any circumstance which tends to justify the penalty of life imprisonment. You must consider all evidence of mitigation. The weight which you give to a particular mitigating circumstance is a matter for your moral, factual and legal judgment.

However, you may not refuse to consider any evidence of mitigation."

■ This instruction was adequate to enable the jury to give independent mitigating weight to aspects of the defendant's character and record and circumstances of the offense. It met all constitutional requirements. There is no substance to defendant's insistence that the jury convicted him of felony murder and sentenced him to death without making any finding of fact regarding his personal culpability under the authority of *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and *Tyson v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). This theory is refuted in *Cabana v. Bullock*, 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986), in which the Court specifically rejected the argument that the Sixth Amendment or any other constitutional provision provides a defendant with the right to have a jury consider the appropriateness of a capital sentence. The court concluded that the decision whether a sentence is so disproportionate as to violate the Eighth Amendment in any particular case, like other questions bearing on whether a criminal defendant's constitutional rights have been violated, has long been viewed as one that a trial judge or an appellate court is fully competent to make. Moreover, there is no question that Leonard Smith, as evidenced by his confession, was the person who shot and killed the victim in this case. *Enmund* and *Tyson* are not applicable.

Defendant also argues that T.C.A. § 39–2–202(a) (Felony Murder) violates Article 1, § 19 of the Tennessee Constitution by removing the issue of whether defendant intended to kill from the jury's consideration. The constitutional provision is cited out of context and without any supporting authority to the effect that "the jury shall have the right to determine the law and the facts, under the direction of the Court, as in other criminal cases." This was precisely the procedure followed in this case. The law is contained in the statute which the trial judge directed to the jury's attention under the evidence presented by the witnesses. Defendant was properly convicted of first degree murder under the evidence in the case. He was not precluded from arguing any theory which might have lessened his degree of culpability. The issue is without merit.

■ Defendant says certain of the trial court's statutory instructions on mitigating circumstances impermissibly limited and misdirected the jury's consideration of his mitigating evidence regarding his mental condition. T.C.A. § 39–2–203(j) provides that in arriving at the punishment the jury shall consider, as heretofore indicated, any mitigating circumstances which shall include, but not be limited to the following: (2) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance; (a) the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication which was insufficient to establish a defense to the crime but which substantially affected his judgment. He argues that the use of the modifier in (j)(2) and (j)(8) mislead the jury in its consideration of evidence of his mental and emotional impairments and intoxication at the time of the offense. In *Penry v. Lynaugh*, 492 U.S. 302, 339–41, 109 S.Ct. 2934, 2958, 106 L.Ed.2d 256 (1989); in holding that mental retardation is a factor that may well lessen a defendant's culpability for a capital offense, the court clearly stated that the Eighth Amendment did not preclude the execution of a mentally retarded person convicted of a capital offense simply by virtue of their mental retardation alone. They concluded that so long as sentencers can consider and give effect to mitigating evidence of mental retardation in imposing sentence, an individualized determination of whether "death is the appropriate punishment" can be made in each particular case. In reaching that result they observed that virtually all of the States with death penalty statutes that list statutory mitigating factors include as a mitigating circumstance evidence that "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct

to the requirements of law was substantially impaired." 492 U.S. at 2956, 109 S.Ct. at 2956. Tennessee jury instructions explicitly mention mental disease or defect in connection with this mitigating circumstance. The adjunct instruction, heretofore noted, enabled the jury to express its reasoned moral response to the evidence in rendering its sentencing decision. There was no likelihood of any juror misapplying these instructions given by the trial court.

Insofar as the State's argument, in reference to this issue, is concerned, it did not exceed the bounds of constitutional limits. Counsel must be allowed reasonable latitude to present their case to the jury. The instructions were correct and it was the State's duty to endeavor to convince the jury that defendant's impairments, if any existed, were less than extreme and substantial.

■ Defendant insists the trial court erred in improperly excluding relevant mitigating evidence, and making remarks which prejudiced defendant's case in the eyes of the jury. Under the Eighth and Fourteenth Amendments to the Federal Constitution a capital sentencer must not be precluded from considering as a mitigating factor any aspect of a defendant's character or record and any circumstances of the offense offered by the defendant as a basis for a sentence less than death. *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). T.C.A. § 39–2–203(c) provides that in the sentencing proceeding, evidence may be presented as to any matter that the Court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut statutory aggravating circumstances; and, any evidence tending to establish or rebut any mitigating factors. Under either the constitution or the statute, however, the Court retains its traditional authority to exclude irrelevant evidence. *Lockett v. Ohio*, 438 U.S. 586, 604, n. 12, 98 S.Ct. 2954, 2965, n. 12, 57 L.Ed.2d 973 (1978); *State v. Johnson*, 632 S.W.2d

542, 548 (Tenn.1982). The trial judge performed his duties correctly in this regard and the jury was correctly and properly advised.

■ Defendant argues that the trial court violated his constitutional rights by sustaining the State's objection to the testimony of certain witnesses on the basis of relevancy and materiality. These objections involved:

(1) Questions asked *defendant's brother, Leroy Smith*, about (a) his wife's positive influence on him and (b) episodes of their father's abusive behavior that did not occur when defendant was in the household.

(2) Questions asked *defendant's pastor*, about his own beginnings and positive influences on him in his early years.

(3) Qualifications of *Robert Clark, defendant's former principal*, relative to his opinion as to why a person developed to be like defendant was at the ages of 12 to 14.

(4) Testimony of *Dr. Pamela Auble*, about violent and abusive behavior of defendant's grandfather which she had heard from family members other than the defendant and about family history collected from people other than defendant.

The questions asked Leroy Smith and Bobby Clark were of marginal relevance at best. Clark probably could have been qualified to give his opinion but defense counsel made no attempt to do so, after objection was made to his testimony. Dr. Auble's testimony seems relevant to sentencing and mitigation but, as the Court pointed out, the evidence was "getting too far back in the family tree" and, in any event, was cumulative. The evidence proffered lacked relevance and its exclusion was harmless beyond a reasonable doubt. There was an abundance of evidence presented and admitted on the mitigating factors defendant contends warranted admission of that excluded. Our review of the record confirms defendant was not restricted in his presentation of mitigating factors. The issue is without merit.

■ We have reviewed defendant's complaint that the provisions of T.C.A. § 39–2–203(f) and (h)[3] caused the jurors to be mislead and prevented them, as individuals, from giving effect to his mitigating evidence when deciding the ultimate question of an appropriate punishment. He also says, by prohibiting the jury from being informed of the consequences of its failure to agree on punishment, T.C.A. § 39–13–204(h) added unnecessary confusion and uncertainty to the jury's deliberations, thus creating an unacceptable risk that his death sentence was imposed in an arbitrary manner. He recognizes that this Court recently decided two (2) cases in which a similar challenge was mounted and rejected. *State v. Thompson*, 768 S.W.2d 239 (Tenn.1989) and *State v. Bates*, supra. The Court has previously considered other challenges to the statute on numerous occasions.[4] However, defendant submits that "in view of the unique circumstances of this case ... it is appropriate for this Court to re-examine the unanimity provisions of the death penalty statute in terms of how they impact on the jury's deliberations."

It is argued that requiring unanimity in any verdict rendered by the sentencing jury violates the principles established in *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) and *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), that each juror must be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death. Both *Mills* and *McKoy*, however, deal with sentencing schemes that require the jury to agree unanimously upon the existence of mitigating circumstances before they become a factor in the sentencing process. The Tennessee scheme has no such requirement; each juror is autonomous in considering

mitigating factors. In *State v. Thompson*, supra 768 S.W.2d at p. 251, the Court noted that the Tennessee statute included none of the objectionable features of the instructions in *Mills*. The jury is not required to list, much less agree on, the existence of any mitigating facts. In *Thompson*, as in this case, the trial court emphasized the jury's autonomy in considering mitigating evidence.

As in *Bates*, supra, defendant relies on a number of mitigating circumstances, including (1) the mental age of defendant[5] (2) the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance; (3) his capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law because he was substantially impaired by a mental defect, drug or intoxication which was insufficient to establish a defense to the crime but which substantially affected his judgment.

All of these circumstances were submitted to the jury which rejected these theories of defense. Under the proof in this record, and the correct and proper instructions conveyed to the jury by the trial judge, the record clearly indicates that the jury was not mislead nor were they prevented, individually or collectively, from giving effect to the mitigating evidence when deciding the ultimate question of an appropriate punishment. As in *Bates*, supra, we are satisfied that nothing in the Tennessee statutes, and the instructions given to the jury, or in the verdict form submitted to the jury, was likely to lead any juror to believe that he or she was precluded from considering mitigating circumstances unless all jurors agreed that that circumstances existed.

■ Defendant speculates that because the trial judge deviated from the statutory language of T.C.A. § 39–13–204(f) in deliv-

---

**3.** Amended 1 November 1989, T.C.A. 1990 Supplement.

**4.** See e.g., *State v. Barber*, 753 S.W.2d 659, 670 (Tenn.1988); *State v. Buck*, 670 S.W.2d 600, 609 (Tenn.1984); *State v. Simon*, 635 S.W.2d 498, 505 (Tenn.1982); *Houston v. State*, 593 S.W.2d 267, 278 (Tenn.1980); *State v. Pritchett*, 621

S.W.2d 127, 141 (Tenn.1981); *State v. Melson*, 638 S.W.2d 342, 367 (Tenn.1982); *State v. Strouth*, 620 S.W.2d 467, 471 (Tenn.1981); and *State v. Taylor*, 771 S.W.2d 387, 399 (Tenn. 1989).

**5.** Defendant was 23 years of age.

ering his instructions to the jury at the sentencing phase of the proceedings that a reasonable juror could have interpreted the instructions to mean that the mitigating circumstances in evidence were to be considered seriatim rather than together, thus the jury was mislead and the erroneous instruction misdirected them regarding how to weigh mitigating and aggravating evidence. After instructing the jury under what circumstances they could impose a sentence of death, the trial court instructed them that if the aggravating circumstances proved "do not outweigh beyond a reasonable doubt *each and every* mitigating circumstance or circumstances the punishment shall be life." This language varied from that of T.C.A. § 39–2–203(f) (1982), which at the time of the trial in August, 1989, informed the jury that if they found one or more mitigating circumstances to outweigh statutory aggravating circumstances proved by the State they were required to impose a life sentence. The statute was revised, effective November 1989, to provide that a life sentence would be imposed when aggravating circumstances have not been proven to outweigh *"any mitigating circumstances."* The trial judge did not use the language "any mitigating circumstances" because that terminology was not in the statute at the time of defendant's trial. It is not wise to deviate from statutory language in instructing a jury. However, dictionary definitions make it clear that the trial judge's departure from the directed path was harmless beyond a doubt. Black's Law Dictionary (5th Ed.Rev.1979), p. 455, informs us that the word "any" is equivalent to "each." At p. 498 we are advised that the term "every" is sometimes equivalent to "all," and sometimes to "each." His use of the singular and plural of "circumstance" following the phrase "each and every" also informed the jury that they were to weigh aggravating circumstances against mitigating circumstances both individually and collectively. The trial court used the term "each and every" elsewhere in the jury instructions with a similar meaning. Considering the instructions in their entirety, no reasonable jury could have been mislead or misdirected by the challenged instructions.

Defendant contends that the trial court limited defense counsel's examination of prospective jurors in reference to any bias they might have against non-statutory mitigating circumstances. He makes reference to one isolated ruling of the trial court where, after having exercised great latitude in his examination of prospective jurors, he was subjected to objection by State's counsel after asking the question, "And in regard to the area of capital punishment, what other factors would you consider as reasons not to vote for the death penalty?" In response to an objection that the juror could not respond until he had heard the facts in the case the trial court ruled: "That's correct. That's right. The State must prove beyond a reasonable doubt an aggravating circumstance and then once—then you can consider as a mitigating circumstance anything in the evidence in the case, anything about the defendant or the offense that you believe is a mitigating circumstance. And at this point I don't see how he can say what he might consider as a mitigating circumstance." The trial judge was exercising his proper authority to control the scope of voir dire. Defendant was not precluded from asking about a juror's ability to consider the specific non-statutory mitigating circumstances he intended to raise. There was never any attempt to ask about such circumstances. The court properly sustained the State's objection to the inquiry made. There is no error.

Defendant protests denial of individual sequestered voir dire on death qualification. The trial court declined to grant an individually sequestered voir dire. On the second day of group voir dire, prospective juror Abbott mentioned that overnight she had begun to change her ideas about the death penalty. Two (2) other prospective jurors indicated that as a result of listening to Abbott their feelings about the death penalty had grown stronger. Upon further examination on this issue these persons were excused for cause. Defendant says he lost two (2) qualified jurors who were

subsequently excused for cause when they changed their positions after listening to the responses of other prospective jurors.

This Court has previously rejected the position that death qualification of a capital jury must be conducted by individually sequestered voir dire. *State v. Johnson,* 698 S.W.2d 631, 633 (Tenn.1985); *State v. Porterfield,* 746 S.W.2d 441, 447 (Tenn.1988). These cases turned on a somewhat different issue than that involved here. However, no one, in a case at trial, loses jurors. The jury is the property of neither a defendant nor the State. Defendant's only right is to have a fair trial at the hands of an unprejudiced, unbiased and impartial jury. He has no right to select certain jurors. He has only the right to excuse prospective jurors tendered who are biased and prejudiced. The terms "biased" and "prejudiced" have been limited and defined by statute and case law. *See Long v. State,* 213 S.W.2d 37, 38 (Tenn.1948). The trial court may constitutionally exclude from capital sentencing juries those jurors who are unwilling or unable to obey the law or to follow their oath. *Wainwright v. Witt,* 469 U.S. 412, 421–25, 105 S.Ct. 844, 851–52, 83 L.Ed.2d 841 (1985). Defendant has not established that the group voir dire prejudiced him to the extent that the entire voir dire and impartiality of the jury were invalidated.

Defendant says the order of examining jurors, with the State questioning prospective jurors first and defense going last, foreclosed the possibility of rehabilitation and jurors were improperly excused for cause. There must be some order in the voir dire examination of jurors. That is the court's function. It is the duty of the trial judge to conduct the voir dire in a manner which assures the selection of an unbiased and competent jury. Defendant points to several examples in which he says the jurors were initially opposed to the death penalty, led to respond in a manner that made them subject to exclusion for cause, and then turned over to the defense for rehabilitation. Defendant failed to raise any objection to the procedure employed by the trial judge until after the case had been submitted to the jury. This failure to take action constitutes a waiver to the procedure employed, which we find to be constitutionally sound. The issue is without merit.

Defendant has failed to show prejudice as the result of denial of a motion to submit a proposed questionnaire to prospective jurors prior to the voir dire. The questionnaire requested a response to 34 different questions. The trial court approved the first eight questions on the list which were essentially the material required under Rule 24(g) of the Rules of Criminal Procedure. Defendant was afforded the opportunity during voir dire to question prospective jurors on any of the issues contained in his questionnaire. There was no abuse of discretion and the issue is without merit.

Defendant complains that the trial court erred in the sentencing phase of the trial in allowing the State to admit proof of a previous indictment for armed robbery to which he subsequently plead guilty to simple robbery. This Court noted on review of defendant's previous appeal that the indictment, as well as the conviction, was relevant to show the underlying facts of the offense in order to establish that each offense involved the use or threat of violence to the person. 755 S.W.2d at 764.

By his next assignment defendant contends that the felony murder rule constitutes cruel and unusual punishment. He argues that the degree of the crime is enhanced to first degree murder by the fact that the killing took place during a robbery or attempted robbery. To allow the robbery or attempted robbery, to further enhance the punishment to a death penalty without a further finding of some willful, deliberate or intentional act to kill or injure, should amount to cruel or unusual punishment.

The jury found two aggravating circumstances in this case. They returned a verdict of guilty of first degree murder. Their finding could have been that the killing was intentional. The theory that the homicide was accidental was presented in miti-

gation and rejected unanimously by the jury. The issue is without merit.

Defendant says the trial court's refusal to allow counsel to conduct post-verdict juror interviews prevented him from determining if extraneous prejudicial information or outside influences were factors in the jury's determination of his death sentence. Prior to the motion for new trial a motion was filed to authorize submission of a post-verdict jury questionnaire to the jurors who had decided the case. The trial judge denied the motion for the reason that the questionnaire asked the jurors questions about their state of mind and the things that they considered during the trial. In *State v. Blackwell*, 664 S.W.2d 686, 688 (Tenn.1984), this Court adopted Federal Rule of Evidence 606(b) as the rule governing the admissibility and exclusion of evidence to impeach a jury verdict in this State. More recently, in *State v. Thomas*, 813 S.W.2d 395, 396 (Tenn.1991), this Court discussed Supreme Court Rule 8, EC 7–29, which allows litigants and their counsel to make reasonable investigations to determine if a verdict is subject to legal challenge. The extent of the investigation is implicitly limited by the purposes stated in the rule sanctioning post-trial communications between counsel and former jurors. The Court went on to note that Rule 606(b) lists those factors that invalidate a verdict: Extraneous prejudicial information, improper outside influence, or an agreement to be bound by a quotient or gambling verdict. The record in this case does not reflect that the defendant ever requested or was denied permission to personally interview jurors. He was denied the authority to submit the post-trial questionnaire to the jurors which included questions exceeding the boundaries established by Rule 606(b). The issue is without merit.

▬ Defendant says it was error for the trial judge to instruct the jury during the penalty stage to have no sympathy for the defendant. The instruction objected to was as follows: "You cannot impose the death penalty because of sympathy, prejudice or other arbitrary factors; however, you may weigh any factor you find in the evidence of the entire case as mitigation of the offense." There is no merit to this issue. *See California v. Brown*, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987); *Saffle v. Parks*, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990); *State v. Boyd*, 797 S.W.2d 589, 598 (Tenn.1990), cert. denied 498 U.S. 1074, 111 S.Ct. 800, 112 L.Ed.2d 861 (1991).

Defendant contends that T.C.A. § 39–13–203(g) violates his constitutional rights by mandating that a jury must impose death upon findings that mitigating circumstances do not outweigh aggravating circumstances, and by mandating the jury to impose death upon preconditions being met. He concedes that this statute has been found to be constitutional by this Court. These specific contentions have been previously addressed and rejected by the court in several cases. *See State v. Black*, 815 S.W.2d 166, 185 (Tenn.1991). The issue is without merit.

▬ Defendant has raised several constitutional issues by his contention that the trial court erred in overruling a motion to dismiss the indictment due to the illegality and constitutional frailty of T.C.A. § 39–2–203, 205. First he says that § 39–2–203 provides insufficient guidance to the jury concerning the burden of proof on whether mitigation outweighs aggravation and insufficient directions on the standard of proof the jury should apply in making that determination. The trial judge properly instructed the jury in this case that the State had the burden to prove aggravating circumstances beyond a reasonable doubt and, if any, that such aggravating circumstance or circumstances outweighed any and all mitigating circumstances. This same issue was raised in *State v. Payne, supra,* and settled contrary to defendant's view of the matter.

There is no merit to defendant's complaint that § 39–2–203 does not sufficiently limit the exercise of the jury's discretion once matters in aggravation are found. The statute carefully directs jurors to consider without limitation all relative mitigating evidence. The trial judge instructed the jury that the State must prove beyond

a reasonable doubt that the aggravating factors must outweigh the mitigating factors. Defendant offers no basis for suggesting that the jury disregarded these instructions.

Defendant contends that § 39-2-203 insufficiently limits the exercise of the jury's discretion by mandatorily requiring the jury to impose a sentence of death if it finds the aggravating circumstances to outweigh the mitigating circumstances. We considered this issue in depth in *State v. Boyd*, supra, 797 S.W.2d at p. 596, in which we said: "The statute, taken in its entirety, does not in any way constitutionally deprive the sentencer of the discretion mandated by the individualized sentence requirements of the constitution."

We have previously considered defendant's complaint that § 39-2-203 allows the jury to accord too little weight to nonstatutory mitigating factors and limits the jury's options to impose a life sentence. The trial judge specifically instructed the jury they were not limited to listed mitigating circumstances and should consider any other mitigating factors or circumstances. He went on to define mitigating circumstances and told the jurors that they must consider all evidence of mitigation.

■ Defendant next seems to say that because the statute does not require the jury to make the ultimate determination that death is appropriate, it violates the constitution. It is the jury's duty to weigh and balance aggravating and mitigating circumstances in accordance with the law. This statutory scheme avoids the arbitrary imposition of the death penalty by channelling the discretion of the jury and thus meets Eight Amendment standards.

■ Defendant says the failure of the statute to inform the jury of its ability to impose a life sentence out of mercy is a violation of the constitution. There is no Eighth Amendment requirement that the jury should be so informed. Our capital punishment doctrine is rooted in the principle that the Eighth and Fourteenth Amendment cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be wantonly and freakishly imposed. *See Lewis v. Jeffers*, 497 U.S. 764, 774–76, 110 S.Ct. 3092, 3099, 111 L.Ed.2d 606 (1990). Accordingly, where discretion is afforded a sentencing body on a matter so grave as the determination whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action. *Lewis*, supra, 497 U.S. at p. 774, 110 S.Ct. at p. 3099, citing *Gregg v. Georgia*, 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859. In *State v. Melson*, supra, 638 S.W.2d at p. 366, this Court said, "[T]he idea that 'mercy,' could be extended to a defendant is incorporated in the instructions on mitigating factors; and the admonition against being ruled by passion or prejudice runs throughout." Thus, the statute guides the jury in the exercise of its discretion and enables them to dispense mercy on the basis of the evidence they have heard and the instructions they have received.

■ Defendant expresses dissatisfaction with § 39-2-203 on the basis that it provides no requirement that the jury make findings of fact as to the presence or absence of mitigating circumstances. He says this asserted shortcoming prevents effective appellate review. We disagree with his conclusion for the reasons set forth in *State v. Melson*, supra, at p. 368. "There is no burden of proof as to mitigating factors; and the jury may find that any factor outweighs any aggravating circumstance." If a jury finds that any aggravating circumstances are outweighed, there is nothing which the State can do to change this outcome, while an opposite finding is reviewable by this Court. In reviewing a death sentence the court must determine that the evidence supports the jury's finding of the absence of any mitigating circumstances sufficiently substantial to outweigh the aggravating circumstances which may be found.

T.C.A. § 39-2-203(h) provides, inter alia, that the judge shall not instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury, on the effect of the jury's failure to agree on a

punishment. Defendant recognizes that, under the statute, a hung jury results in an automatic life sentence and postulates that this is unconstitutionally detrimental to him because each juror is deprived of the knowledge that he or she alone can stand between him and the electric chair in the belief that a hung jury means retrial on question of life or death. That is not the only logical conclusion and there is no merit to defendant's contention. In *Williams v. State*, 191 Tenn. 456, 234 S.W.2d 993, 994 (1950), the jury inquired from the trial judge whether or not, if the defendants were sentenced to life imprisonment, or 99 years, could they be pardoned in 10 or 15 years? The judge informed them that the only instructions to govern their actions as jurors were embodied in the written charge. In considering the matter this Court found this was a proper response to the inquiry, saying:

> It was the province of the jury to pass upon the guilt or innocence of the defendants and, if found guilty, to decide what punishment their crime merited. The power to grant pardons is vested exclusively in the Governor, and the jury should not engage in speculations as to what he may or may not do with respect to those incarcerated in the penitentiary. If the Court had responded to this inquiry of the jury by stating the Governor had the power to pardon at any time he saw proper to do so, or the court had stated to the jury that the Commissioner of Institutions has the authority to parole a life prisoner after serving 25 years, less time for good behavior, and the jury had thereupon fixed the punishment at death, the defendants would have had good ground for insisting that but for this instruction the jury would likely have imposed only a penitentiary sentence. It is inferable from this inquiry that the jury was considering a life term in the penitentiary only on condition that the defendants could not be pardoned; hence, had the court advised them that they could be pardoned at any time after conviction, the jury most likely would have imposed a death sentence. In this view of the case it cannot be said

that the refusal of the court to answer the inquiry was prejudicial to the defendants.

■ The defendant says this Court should concede that the imposition of the death penalty violates the constitution for reasons articulated in the dissent in *State v. Dicks*, 615 S.W.2d 126 (Tenn.1981). He also raises the issue in reference to the method of its execution by electrocution. This position was rejected by the majority in *Dicks* as in every case decided during the 10-year interim, most recently in *State v. Black, supra* 815 S.W.2d at p. 178. Defendant has given us no reason to overrule that precedent.

In a scattergun approach defendant says the statute is unconstitutional because it has been imposed discriminatorily on the basis of race, sex, geographic region in the State, and on the economic and political status of the defendant. He gives us no evidence or authority for this assertion which we reject summarily.

■ Defendant cites a portion of § 39-2-203(c) for the complaint that hearsay statements may be admitted provided the defendant is afforded a fair opportunity to rebut any such evidence. Defendant does not cite any instance in which the statute permitted the State to use incompetent evidence against him. Nonetheless, the statute was enacted for the benefit of the defendant as well as the State because it allows the admission of any evidence tending to establish or *rebut* any statutory aggravating circumstances introduced into evidence and any evidence tending to *establish* or rebut any mitigating factors, in addition any evidence which the court deems to have probative value on the issue of punishment may be received so long as the defendant is accorded a fair opportunity to rebut any hearsay statement so admitted. The statute does not authorize the introduction of any evidence secured in violation of the Constitution of the United States or the State of Tennessee. The statute does not violate defendant's right of confrontation.

**24**

Defendant objects to the procedure whereby the State has final argument to the jury at the sentencing phase. He says that due to the heightened standard of reliability that attaches in a death penalty sentencing hearing, that if he chooses to do so, he should be allowed to argue to the jury last. He cites two cases, *Herring v. New York*, 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975); and *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), neither of which support his position. In *Melson v. State*, supra, this Court dealt with the issue saying, "this statute provides for closing argument first by the State, then by the defendant, and last by the State. This is the same order of argument which exists in any proceeding, with the party having the burden of proof arguing first and last. Thus, this order is not inherently prejudicial to the defendant or favorable to the State in its use at the sentencing stage of a death penalty proceeding." We held that the Tennessee Death Penalty Statute is constitutional. Defendant has provided us with nothing to show that the statute is applied arbitrarily, capriciously or with passion in this case.

T.C.A. § 39–2–205 provides for mandatory review of any death sentence. In conducting this review we are required to determine whether the sentence of death was imposed in any arbitrary fashion. In view of the necessity to remand for re-sentencing we omit this statutory review.

However, we are deeply troubled about the overall effect of the admission of evidence of the sentence in the *Pierce* case at the sentencing hearing in the second trial.

To put the issue in context, prior to the sentencing phase of the trial the judge held a motion hearing. It is very difficult to discern from the transcript the exact nature of the motions and the rulings by the trial judge. It is clear that defense counsel objected to admission of evidence surrounding the *Pierce* case as an aggravating circumstance. Although the rulings were apparently plain to the participants, they are not quite as clear from a reading of the record.

Shortly after the foregoing matters were discussed the attorney general offered proof of prior convictions he intended to introduce stating, "I intend to read in each of the three (3) prior convictions the indictment relating to the charge for which he was convicted, and then read the judgment. Particularly the murder conviction, the judgment form just cannot be handed to the jury because it shows that the life sentence [for the *Pierce* homicide] is to be served consecutively to the death by electrocution" [for the Webb homicide]. No other mention was made in reference to the sentences in each of the prior convictions.

In the introduction of the State's proof the attorney general read a copy of an indictment, from Carter County for robbery with a deadly weapon. Attendant documents showed a guilty plea to simple robbery with a sentence of six (6) years in the penitentiary.

The second indictment showed a conviction of armed robbery with no sentence indicated.

The third indictment was for the first degree murder of Mr. Pierce. The judgment was read showing that defendant was found guilty of first degree murder by a jury. The indictment and judgment were tendered as an exhibit.

The attorney general then said "Your Honor, the last judgment that I indicated for the conviction of first degree murder would show that the sentence was fixed at life imprisonment." No objection was made by the defense.

The defendant says the introduction of the evidence pertaining to his earlier sentence prejudiced his sentencing in this case. He relies on the observation of the Court in the earlier case in which Justice Brock, the author of the opinion, commented, "As a practical matter, making known to the jury the defendant's punishment in that case [*Pierce* ], effectively eliminated the option of life imprisonment as a sentence for defendant in the Webb case."

The State, on the other hand, while agreeing that proof of the sentence for the *Pierce* murder was error under this Court's

earlier ruling, insists that the error has been waived by defendant's failure to object. The suggestion is made that the failure to object was a strategic maneuver by the defense to obtain a life sentence.

The issue of whether either or both counsel were attempting to sandbag the other is a matter of pure speculation. What seems quite apparent, however, is that the life sentence in the *Pierce* case was considered during sentencing in the case before us.

At a point early on in their deliberations the jury sent a note to the Court asking the following information.

"(1) Define life sentence;
(2) Define consecutive and concurrent life terms and which would apply if a second life sentence was given;
(3) When would parole apply."

■ As we have noted previously the trial judge declined to respond, and properly so. The error in admission of the *Pierce* sentencing evidence is compounded by ignoring the admonition given by this Court in the earlier case "[T]hat the prejudice to the defendant is obvious and the punishment in the Webb case should have been determined without regard to the *Pierce* case *or to the punishment to which the defendant was sentenced in that case.*" The singular exception made in the prior case was that evidence of the *Pierce* homicide was to be excluded, except insofar as it might be relevant or admissible through defendant's proof or in some other manner or as an aggravating circumstance for purposes of sentencing. We are persuaded that the only viable solution is a new sentencing hearing.

■ Moreover, based on the ruling of the Court in *State v. Donald Ray Middlebrooks,* 840 S.W.2d 317 (Tenn.1992), the case is be remanded to the trial court for resentencing. Defendant was indicted and convicted for murder in the first degree of Novella Webb during the perpetration of a robbery. The jury has found two (2) aggravating circumstances; (1) that defendant was previously convicted of one (1) or more felonies, other than the present charge, which involved the use or threat of violence to the person, and (2) that the murder was committed during the perpetration of a robbery. The *Middlebrooks* rule establishes that elimination of the aggravating circumstance that the murder was committed while defendant was engaged in the perpetration of a robbery requires the jury to reconsider the evidence to determine if the sentence of death is appropriate in this case.

The judgment of guilt is affirmed. The case is remanded to the trial court for resentencing in accordance with this opinion. Costs are assessed against the defendant.

Justices Drowota and O'Brien continue to adhere to their dissent in *Middlebrooks* wherein they stated a remand for resentencing was unwarranted.

DROWOTA and ANDERSON, JJ., concur.

REID, C.J., and DAUGHTREY, J., filed Separate Concurring and Dissenting Opinions.

REID, Chief Justice, concurring in part and dissenting in part.

I concur with the reversal of the sentence; however, I would affirm the conviction and reduce the sentence to life imprisonment. For the reasons stated in *State v. Middlebrooks,* 840 S.W.2d 317 (Tenn.1992), I would hold that Article I, Section 16 of the Tennessee Constitution prohibits the imposition of the death penalty in this case. The record does not show that the killing was deliberate or intentional or accompanied by a conscious purpose of producing death or a conscious realization that death will likely occur. *Supra* at 353 (Reid, C.J., concurring and dissenting).

DAUGHTREY, Justice, concurring in part and dissenting in part.

I concur in the result reached by the majority and in the view expressed by Chief Justice Reid in his dissenting opinion. Because this case has been tried twice previously and must now be tried again, I write separately to emphasize that every

effort should be made to avoid further error and thereby invite further litigation.

At this juncture, the principal decision upon rehearing is for the state to make, and that is whether once more to seek the death penalty. If the state does ask for the death penalty and a jury must therefore be selected, several significant issues present themselves. They are matters that I believe cannot be dismissed as merely "discretionary with the trial court," thereby evading substantive review. Discretion assumes the exercise of a wise choice between (or among) alternatives, based upon developed standards pertaining to the particular question to be determined.

For example, on rehearing, the need for another change of venue ought to be carefully reassessed, as should the need for individual, sequestered voir dire of prospective jurors on such matters as the effect of pre-trial publicity, the existence of individual bias, and the personal convictions of each venireperson about the death penalty. In this as in most cases, group voir dire on preliminary questions may be appropriate, as well as expeditious. On the other hand, there is very little beyond expedition to be gained by group exposure to sensitive questions regarding the formulation of opinion about the defendant's guilt by any one prospective juror, or concerning his or her ability to follow the law of capital punishment. At the same time, there is much to be lost by not utilizing individual, sequestered voir dire.

Under the circumstances of this case, the goal of making the verdict immune to challenge on the basis of juror contamination prior to trial or during voir dire is surely worth the relatively minor inconvenience of moving the trial to another venue, or the relatively small amount of extra time required by individual questioning. Many of the issues discussed in the lead opinion will not arise at the new sentencing hearing. Others will. Of the others, it seems to me that the most crucial concern the impartiality of the jury and, thus, the integrity of their verdict.

## ORDER DENYING PETITION TO REHEAR

The Court has carefully considered the Petition to Rehear filed in this cause and concludes it should be denied.

REID, C.J., and DROWOTA, DAUGHTREY and ANDERSON, JJ., concur.