# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### JANUARY SESSION, 1999

**FILED**

February 10, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | |
| | ) | No. 02C01-9709-CR-00365 |
| **Appellee** | ) | |
| | ) | **SHELBY COUNTY** |
| **vs.** | ) | |
| | ) | **Hon. John P. Colton, Jr., Judge** |
| **DAVID M. KEEN,** | ) | |
| | ) | **(Sentencing)** |
| **Appellant** | ) | |
| | | **FIRST DEGREE MURDER, CAPITAL CASE** |

For the Appellant:

**W. Mark Ward**
Asst. Shelby Co. Public Defender
201 Poplar Avenue, Suite 2-01
Memphis, TN 38103

**A C Wharton, Jr.**
Public Defender `

For the Appellee:

**John Knox Walkup**
Attorney General and Reporter

**Michael E. Moore**
Solicitor General

**Kenneth W. Rucker**
Assistant Attorney General
Criminal Justice Division
425 Fifth Avenue North
2d Floor, Cordell Hull Building
Nashville, TN 37243-0493

**William L. Gibbons**
District Attorney General

**Thomas D. Henderson** and
**Ms. Alonda Horne**
Asst. District Attorneys General
Criminal Justice Complex, Suite 301
201 Poplar Avenue
Memphis, TN 38103

OPINION FILED: _____

AFFIRMED

**David G. Hayes**
Judge

**OPINION**

In this capital case, the appellant, David M. Keen[1], appeals as of right the imposition of his sentence of death by a Shelby County jury following his guilty plea to first degree murder in the perpetration of rape.[2] In his direct appeal to the supreme court, see State v. Keen, 926 S.W.2d 727 (Tenn. 1994), the appellant's conviction was affirmed; however, the court reversed the sentence of death due to invalid jury instructions. The appellant's case was remanded to the Criminal Court of Shelby County for a resentencing hearing at which he again received the death penalty.

On appeal, the appellant raises the following issues:[3]

I. Whether the trial court erred in denying the appellant's request to allow the jury to consider the sentencing option of life without parole;

II. Whether the trial court erred by not informing the jury that the appellant would have been eligible for parole after serving 25 years of a sentence of life imprisonment;

III. Whether the evidence is sufficient to support the especially heinous, atrocious, or cruel aggravating circumstance pursuant to Tenn. Code Ann. § 39-13-204(i)(5);

IV. Whether the (i)(5) jury instruction which charged in the disjunctive "torture or serious physical abuse" denied the appellant his constitutional right to a unanimous jury verdict and whether the instruction failed to narrow the class for death eligibility;

V. Whether the trial court erred by refusing the appellant's special request instruction for the especially heinous, atrocious, or cruel aggravating circumstance and the special request instruction regarding circumstantial evidence;

VI. Whether the trial court erred in denying the appellant's motion to instruct the jury that it could consider sympathy based on the evidence presented as a mitigating circumstance;

VII. Whether the prosecution exercised its peremptory challenges in a racially discriminatory manner;

---

[1]At the time of the offense the appellant was twenty-seven years old.

[2]The appellant's guilty plea was entered on February 12, 1991. Although the record does not contain a copy of the guilty plea, apparently the appellant also pled guilty to aggravated rape. However, the appellant does not challenge this conviction in this instant appeal.

[3]Contained within the appellant's twelve general issues are other specific allegations of error set forth as sub-issues.

VIII. Whether the trial court erred in refusing individual voir dire as to the prospective jurors' exposure to pre-trial publicity and as to the jurors' beliefs and attitudes about the death penalty;

IX. Whether the appellant was prejudiced by the State's introduction into evidence of a photograph of the victim taken during her lifetime and a morgue photograph of the victim;

X. Whether the trial court erred in allowing the State to make victim impact references during its closing argument;

XI. Whether Tennessee's death penalty statutes are constitutional;

XII. Whether the jury imposed an arbitrary and disproportionate sentence.

After a careful review of the briefs and record in this appeal, we affirm the judgment of the trial court.

## RESENTENCING HEARING

The proof at the sentencing hearing established that Ashley Nicole "Nicki" Reed, an eight-year old, lived with her grandparents, Mr. and Mrs. Wilson; her mother, Debbie Wilson; the appellant, Debbie's live-in boyfriend; and three siblings in Millington in a three bedroom mobile home. The victim's grandparents left Millington around 4 p.m. on the afternoon of March 17, 1990, to dine and play bingo at the VFW Club in West Memphis, Arkansas. The grandchildren were spending the night with various friends. In particular, Nicki had made plans to stay with the Abbotts, neighbors of the Wilsons.

While traveling to the VFW, Mr. Wilson and his wife were met by the appellant and Debbie Wilson. The appellant and Debbie followed her parents to the VFW. After arriving at the club, Mr. Wilson became concerned about Nicki's overnight accommodations. The appellant volunteered to return to Millington to check on Nicki, leaving around 5:30 p.m. in Mr. Wilson's vehicle. Mr. Wilson testified that the appellant returned to the VFW around 7:30 p.m. and told him that Nicki was staying at the Abbotts. The foursome concluded their games of bingo and returned to Millington later

3

that evening.

Wilson testified that he had a green blanket that usually lay across his front seat; and that night when he returned home around 11 p.m., he noticed that it was missing. Wilson asked the appellant about the blanket, and the appellant stated that he placed it on the backseat. At this time, Wilson noticed nothing unusual about the appellant's behavior.

When Nicki failed to return home the following morning, the Wilsons became concerned. Mrs. Wilson contacted the Abbotts and learned that Nicki had not spent the night with them. Around 9:30 a.m. Sunday, the foursome, including the appellant, formed a search party for the victim. After searching for hours, the appellant and Debbie went to the police station to file a missing person report. When they did not return, Mr. Wilson decided to go assist them. Upon opening the passenger's door of his vehicle, he discovered Nicki's underpants on the floorboard.

Sammy Wilson, a captain with the Millington Police Department, testified that he became suspicious of the missing person report related by the appellant. Consequently, the appellant was provided *Miranda* warnings. In the appellant's first statement to the police, he denied any involvement in the crime. However, afterwards, the appellant told Captain Wilson, "I threw her [victim] in the river . . . down by the airport." The appellant then led the officers to the Wolf River where he had thrown the victim's body off a boat ramp near Auction Street Bridge at the north end of Mud Island. After an extensive search, the victim's nude body, her shoes and clothing, all of which were wrapped tightly in a green blanket, were discovered in the river.

Following the discovery of the victim's body, the appellant again admitted to murdering the victim and provided additional details of her death. The appellant stated they had had an argument over Nicki's seatbelt and that she hit her head on the door

4

of the car. He stated that he put his "left hand on her throat, and my right hand over her mouth."

Sergeant John Wilburn of the Memphis Police Department testified that he also took a statement from the appellant in which the appellant admitted to sexually abusing the victim.

> I pulled off to the side of the road and undressed Ashley, and undid my pants, and I held my hand over her throat and tried to penetrate. I felt crap and I stopped, and Ashley turned blue in the face. She wasn't breathing. I tied a shoe lace around her neck and she still was not breathing. I untied the shoe lace, wrapped her up in a blanket, tied the blanket together, and dumped her off into the river. . . . I was on top of her with my hand on her throat.

Dr. Jerry Francisco, the Shelby County medical examiner, testified that the victim weighed approximately sixty-eight pounds. A ligature mark, caused by strangulation with a shoestring, circled the neck and numerous scrapes and bruises surrounded the mark. He testified that the victim had multiple scrapes and bruises to her face and neck. He stated that those bruises on the face of the victim were exclusive from those related with the ligature strangulation. He also noted another contusion to the victim's left arm.

Additionally, the victim exhibited tears, bruises, and scrapes all received prior to death to the posterior area of the vaginal wall. Sperm heads were present within the victim's vagina. The victim also had fluid in her lungs indicating that she was alive when she was submerged under water. Although there was evidence of drowning, the doctor opined that the cause of death was ligature strangulation. The doctor stated that ligature strangulation would have produced either death or unconsciousness in a matter of seconds.

In mitigation, the defense presented the testimony of Evelyn Brieschke, the appellant's adoptive mother since he was four years old. She testified that the

5

appellant and his brother Allen, during their early childhood, were malnourished, often nervous, unable to play or interact socially with others, had difficulty sleeping, ran fevers, and constantly urinated while asleep. When the appellant started to school, the doctor placed the appellant on Ritalin. In his teenage years, Ms. Brieschke stated that he often skipped school and had stolen a vehicle. She noted a letter from a psychiatrist, written just prior to her adoption of the appellant, which stated that the appellant needed help; however, she did not receive this letter until the appellant was sixteen.

Robert Brieschke, the appellant's adoptive father, testified that when they adopted the appellant they changed his name from Darryl Tooman to Darryl Brieschke[4]. He reiterated the appellant's early childhood problems. He stated that the appellant saw school counselors, private counselors, and other county services. While in school, the appellant was diagnosed with minimal brain dysfunction. When he was eighteen, the appellant entered the Navy becoming a medical corpsman. After the appellant left the Brieschke's home, he changed his name to David Keen.

Allen Brieschke, the appellant's natural brother, testified that the children suffered under a physically abusive, alcoholic father, Serge Tooman. The Toomans, who originally were from Illinois, relocated periodically due to their failure to pay bills and conflicts with the local authorities. The family kept several animals in the house with them, and their father would kill them in front of the children threatening to do the same to the children if they misbehaved. Allen stated that his natural mother had abandoned all the children when Allen was four years old and the appellant was three. Subsequently, Allen and the appellant were placed under foster care where they were subjected to various forms of corporal punishment and physical abuse.

---

[4]We note the appellant has gone by several names over his lifetime as testified to by his adoptive parents and siblings: Darryl Lee Ness, Darryl Lee Cole, Darryl Lee Holiday, Darryl Brieschke, Darryl Tooman, and his name under this indictment, David Keen.

Darlene Krone, the step-sister of the appellant, testified that she and her brothers lived in very "spartan" conditions in houses, apartments, and farmhouses during the first three years of the appellant's life. She also recounted incidents of her step-father killing animals and other abuse of burning her older sister. Eventually, the Tooman children were placed in different foster care homes. She testified that she had been sexually abused by her older brother Willis when she was fifteen and has been receiving counseling for her childhood experiences and this sexual abuse. However, she testified that she has had minimal contact with the appellant since he was two and a half and that the appellant was not around for most of her experiences. She stated that the appellant was two and a half when he last was exposed to the abusive step-father, and she never saw her step-father strike the appellant.

Linda Gehringer, the oldest step-sister of the appellant, testified that the family moved twenty-six times in two years. She stated that both her father, Willis Sr., and step-father, Serge, were abusive. Her step-father would beat them with electrical cords and two by four boards. She had seen her step-father abuse the appellant although she recalled no specific instances. She stated that the appellant was taken to the hospital at one point for malnutrition. She took care of the appellant from the time he was six months old until they were separated when he was three. She testified that she was sexually abused for a year by the appellant's grandfather Barney when she was nine years old. Then, she was sexually abused by the appellant's father Serge when she was eleven. She described their childhood as "an environment of terror." As a result, she has been in counseling for the majority of her life.

Dr. John Ciocca, a clinical psychologist, testified that the appellant's IQ ranged between 105 and 110. Based upon interviews and psychological evaluations, he opined that the appellant suffered from intense depression, disorientation from reality, personality problems, post-traumatic stress disorder, suicidal tendencies, pedophilia, and attention-deficit disorder. One of the tests demonstrated the "presence of

7

psychotic-like symptoms;" however, Dr. Ciocca felt that he was certainly competent to stand trial.

Also, he interviewed the appellant's adoptive parents, his brother, and two step-sisters. He testified that the appellant has had "memories, dreams, and recollections of being anally raped," by his first foster father. However, none of the records indicate that any such abuse occurred. At the age of four, the appellant was diagnosed with "hyperkinetic syndrome," commonly known today as attention-deficit disorder, for which the appellant was placed on Ritalin. He testified that the appellant's enuresis or bedwetting, eating behavior, and hiding from visitors carried over into his new home environment with the Brieschkes. Ciocca related that the appellant was placed in Winnebago State Hospital, a facility in Wisconsin for treating teenagers with psychological problems, when the appellant was seventeen after his involvement with marijuana, alcohol, and a stolen vehicle.

Dr. Ciocca had reviewed the findings of Dr. Hutson, another psychologist, who determined that the appellant was either extremely emotionally upset or was "faking bad" based upon his MMPI test results and that "he [appellant] was still manipulating." Dr. Ciocca also testified that his results on the MMPI test could possibly indicate that the appellant was "faking bad" or that the appellant was "in distress." Therefore, Dr. Ciocca testified that he based none of his findings upon the MMPI, but rather upon other administered psychological tests.

Upon completion of their deliberations, the jury unanimously found (1) the murder was committed against a person less than twelve years of age and the defendant was eighteen years of age, or older, see Tenn. Code Ann. § 39-13-204(i)(2), and (2) the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. See Tenn. Code Ann. § 39-13-204(i)(5). Finding no mitigating circumstances sufficiently substantial to

8

outweigh the statutory aggravating circumstances, the jury returned a verdict of death by electrocution.

## I. Life without Parole Instruction

First, the appellant contends that the trial court erred by denying his request to instruct the jury regarding the sentencing option of life without parole. Therefore, he asserts that the death penalty as applied in this case violates the Eighth and Fourteenth Amendments to the United States Constitution and Article 1, Sections 8 and 16 of the Tennessee Constitution. The State responds that no constitutional violation occurred because the appellant's offense predated the additional sentencing option of life without the possibility of parole.

The present offense occurred on March 17, 1990, prior to the effective date of Tenn. Code Ann. § 39-13-204(f)(2) (Supp. 1993)[5]; however, his resentencing hearing occurred in August of 1997. The effective date of the sentencing option of life without the possibility of parole became applicable to all offenses committed <u>on or after</u> July 1, 1993. (Emphasis added). Before the effective date of this amendment, only two punishments were available for those convicted of first-degree murder, life imprisonment or death. <u>See</u> Tenn. Code Ann. § 39-13-204 (amended 1993).

In a similar issue, the supreme court in <u>State v. Cauthern</u>, 967 S.W.2d 726, 734-736 (Tenn. 1998), <u>reh'g denied</u>, (May 18, 1998), <u>cert. denied</u>, -- U.S. --, 119 S.Ct. 414 (Nov. 2, 1998), in which the relevant offense occurred prior to the effective date of the sentencing option, held that the trial court lacked the statutory authority to instruct the

---

[5]We note the available punishments for first-degree murder following the amendment are (1) death; (2) imprisonment for life without the possibility of parole; or (3) imprisonment for life. Tenn. Code Ann. § 39-13-202(b) (1993 Supp.). Also following this date, the legislature requires that jurors be instructed "that a defendant who receives a sentence of imprisonment for life shall not be eligible for parole consideration until the defendant has served at least twenty-five (25) full calendar years of such sentence." Moreover, the jury must be instructed that "a defendant who receives a sentence of imprisonment for life without the possibility of parole shall never be eligible for release on parole." Tenn. Code Ann. § 39-13-204(e)(2) (1993 Supp.).

jury with this option and that the statute did not apply retroactively.  See also State v. Bush, 942 S.W.2d 489, 503 n. 8 (Tenn. 1997), reh'g denied, (Apr. 28, 1997), cert. denied, -- U.S. --, 118 S.Ct. 376 (Nov. 3, 1997); State v. Carter, No. 02C01-9601-CR00002, (Tenn. Crim. App. at Jackson, May 5, 1997).

However, the appellant contends that the present case is distinguishable from *Cauthern* (1) because *Cauthern* only presented a statutory challenge and the supreme court failed to address the constitutional issues presently raised by this appellant and (2) because *Cauthern* specifically objected to such an instruction at trial where the present appellant specifically requested such an instruction.  Therefore, the appellant contends that limiting the application to crimes committed on or after July 1, 1993, violates the federal and state constitutions.

We agree with the State that *Cauthern* controls.  The trial judge instructed the jury appropriately based upon the existing sentencing options under the law of Tennessee at the time the offense.  See Cauthern, 967 S.W.2d at 734-736; Carter, No. 02C01-9601-CR00002.   At the time of the appellant's offense, there was no constitutional requirement that a state have the sentencing option of life without the possibility of parole.   The legislature chose prior to the 1993 Amendment to only have two options of punishment for first-degree murder, those being life and death.

Because the jury was not provided the option of considering as punishment life without the possibility of parole, the appellant contends that the death penalty in this case constitutes cruel and unusual punishment.  The appellant cites State v. Black, 815 S.W.2d 166, 189 (Tenn. 1991) for the proposition that the death penalty in the instant case is cruel and unusual punishment because without an option of life without the possibility of parole instruction it does not conform to "contemporary standards of decency," and it "results in an excessive sentence based on an illegitimate penological interest."   However, the death penalty in the state of Tennessee has been found

10

constitutional even without the sentencing option of life without the possibility of parole. See e.g., Black, 815 S.W.2d at 185-191; State v. Boyd, 797 S.W.2d 589, 597-599 (Tenn. 1990); State v. Thompson, 768 S.W.2d 239, 252 (Tenn. 1989).

Within this issue, the appellant contends that any statutory sentencing scheme that omits the sentencing option of life without the possibility of parole where the death penalty is an option affects the reliability of the verdict and effective appellate review. The appellant asserts that a capital sentencing jury is often concerned with parole considerations citing statistics contained within various articles and law reviews. However, the record is void of evidence with regard to any of the appellant's contentions. See State v. Hall, 958 S.W.2d 679, 715 n. 6 (Tenn. 1997), cert. denied, -- U.S. --, 118 S.Ct. 2348 (1998); State v. Smith, 857 S.W.2d 1, 23 (Tenn. 1993). Moreover, as the State contends, neither the federal nor state constitutions require or forbid that parole information or other sentencing information be given to a capital sentencing jury. See Smith, 857 S.W.2d at 11 (citing State v. Bates, 804 S.W.2d 868 (Tenn.), cert. denied, 502 U.S. 841, 112 S.Ct. 131 (1991) and California v. Ramos, 463 U.S. 992, 103 S.Ct. 3446 (1983)). The Supreme Court allowed the states to determine whether the sentencing jury could consider parole considerations. Ramos, 463 U.S. at 1014, 103 S.Ct. at 3460. Tennessee has declined to extend such information to the jury.

Next, the appellant again attempts to enter the back door to challenge the death penalty under the "evolving standards of decency" in the state of Tennessee because of the omission of a life without the possibility of parole instruction. In support of his contention the appellant cites other states recently adding a life without parole as a sentencing option. The appellant mistakenly relies upon the provisions of Utah Code Ann. § 76-3-207.5 (1995) where the legislature added the sentencing option of life without the possibility of parole in which the requisite date applies to the defendant's date of sentencing. The Tennessee statute differs because our requisite date is the

date of the offense. See Tenn. Code Ann. § 39-13-204(f)(2). The appellant also relies upon Miss. Code Ann. § 97-3-21 (1994) where the Mississippi legislature added this sentencing option which applies to resentencing proceedings following July 1, 1994.

The State cites cases from Maryland and Indiana which have statutes similar to that in Tennessee applying the option to those offenses occurring after a requisite date. Booth v. State, 608 A.2d 162, 173-174 (Md. 1992); Collins v. State, 568 A.2d 1 (Md. 1990); State v. Alcorn, 638 N.E.2d 1242, 1246 (Ind. 1994). Both states found their statutes presented no constitutional violations to the defendant or rendered their verdict any less reliable. Collins, 568 A.2d at 15; Booth, 608 A.2d at 173-174; Alcorn, 638 N.E.2d at 1246.

We conclude that our sentencing scheme before the introduction of the life without possibility of parole option in no manner violates the appellant's constitutional rights, renders his jury verdict any less reliable, or hinders his appellate review. The only options available for the appellant were instructions for death and life with parole, and the trial court was without authority to instruct otherwise. See Cauthern, 967 S.W.2d 726.

Next, the appellant argues that the death sentence rendered for purposes of incapacitation constitutes excessive punishment, especially without the benefit of a life without possibility of parole instruction. Other factors in support of a death sentence include general deterrence and retribution. Those factors are appropriate for consideration by the legislature and not this court. Black, 815 S.W.2d at 190. As stated previously, the sentencing scheme under which this appellant was sentenced has been repeatedly upheld by the Tennessee Supreme Court. Id.; Smith, 868 S.W.2d 561 (Tenn. 1993).

The last contention of the appellant within this issue is that the trial court's

refusal of the life without the possibility of parole option violated the appellant's equal protection rights under the Fourteenth Amendment. The appellant claims that four defendants[6] who committed their offenses prior to the July 1, 1993 date were "allowed the benefit of the life without parole sentence." However, the appellant has failed to sufficiently demonstrate, document, or cite that the juries in these cases were instructed on life without the possibility of parole. Tenn. R. App. P. 27(h); Tenn. R. Crim. P. 10(b) and 19(c)(4). Nor have we found any evidence that they were so instructed. Moreover, if the juries in these cases had been so instructed, the sentencing option of life without the possibility of parole was not yet in effect. See Tenn. Code Ann. § 39-13-204(f)(2) (amended 1993); Cauthern, 967 S.W.2d 726.

In addition, to bring an effective claim for an equal protection violation, the appellant must prove that the legislature enacted the life without parole amendment with a discriminatory purpose. McCleskey v. Kemp, 481 U.S. 279, 107 S.Ct. 1756 (1987); State v. Irick, 762 S.W.2d 121, 129 (Tenn. 1988); State v. Porterfield, 746 S.W.2d 441, 451-452 (Tenn. 1988). Here, the appellant has failed to meet the standard imposed upon him. For the above stated reasons, this issue, as well as its numerous sub-issues, are meritless.

## II. Failure to Inform Jury of Parole Eligibility in Twenty-Five Years

The appellant asserts that the trial court's failure to inform the jury that he would be required to serve twenty-five years for a life sentence violated his federal and state constitutional rights under the Eighth and Fourteenth Amendments of the United States Constitution and Article I §§ 8 and 16 of the Tennessee Constitution. Also, he argues that the omission of such an instruction violates due process under Simmons v. South

---

[6]The defendants and their requisite date of offenses are as follows: Jonathon Stephenson (Cocke County #5012 -December 3, 1989); Steven Lewis (White County #9289F- March 30, 1992); Wayne Adkins (Washington County #13627 - March 30, 1992); and Bruce Reliford (Shelby County #9306437- December 24, 1992).

Carolina, 512 U.S. 154, 114 S.Ct. 2187 (1994). Specifically, he contends that such an omission allows the jury to speculate and underestimate the amount of time a defendant must serve.

In essence, this appellant invites us to overrule our supreme court which we are unable to do. See Keen, 926 S.W.2d at 738; Smith, 857 S.W.2d at 11; Bates, 804 S.W.2d at 881-82. Regarding the extension of due process under *Simmons*, we decline the appellant's invitation for the same reason. See Bush, 942 S.W.2d at 502-503; State v. Caughron, 855 S.W.2d 526, 543 (Tenn. 1993); State v. Payne, 791 S.W.2d 10, 21 (Tenn. 1990), aff'd, 501 U.S. 808, 111 S.Ct. 2597 (1991). Accordingly, the issue is without merit.

### III. Sufficiency of the Aggravating Circumstance

The appellant challenges the sufficiency of the evidence to support Tenn. Code Ann. § 39-13-203(i)(5) (1989 Supp.) in that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to cause death." Specifically, he contends that the evidence did not establish torture or serious physical abuse. The State contends the aggravating circumstance was established beyond a reasonable doubt.

Our standard of appellate review for the sufficiency of an aggravating circumstance is whether the aggravating factor has been established beyond a reasonable doubt. See State v. Williams, 690 S.W.2d 517, 530 (1985) (citing Jackson v. Virginia, 443 U.S. 307, 317, 99 S.Ct. 2781, 2789 (1979)). "Torture" has been defined as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." Williams, 690 S.W.2d at 529; see also State v. Blanton, 975 S.W.2d 269, 280   (Tenn. 1998), petition for cert. filed, (Dec. 2, 1998); State v.

14

Odom, 928 S.W.2d 18, 26 (Tenn. 1996). "[S]erious physical abuse beyond that necessary to produce death" means just that; there must be serious physical, not mental, abuse, *i.e.,* "an act that is 'excessive' or which makes 'improper use of a thing' or which uses a thing 'in a manner contrary to the natural or legal rules for its use.'" Odom, 928 S.W.2d at 26 (quoting Black's Law Dictionary 11 (6th ed. 1990)).

In the case *sub judice*, the victim suffered at the hands of her mother's live-in boyfriend. The appellant took the victim for a drive lasting approximately thirty minutes to a remote location. A struggle ensued within the car in which the victim's head hit the car door. The appellant totally undressed the victim. By his own admission, the appellant, while lying on top of the sixty-eight pound victim, penetrated and manually strangled the victim. The medical examiner testified that the victim suffered from multiple scrapes and bruises to her face which had nothing to do with the ligature strangulation. Moreover, she experienced tears, bruises, and scrapes to her vaginal area while alive. The appellant's brutal rape of his helpless victim stopped only after she began to defecate and turned blue. He then proceeded to strangle her with his shoestring until she slowly suffocated to death. Her lifeless body was then thrown into the river. The medical examiner testified that death would have occurred in a matter of minutes and if not, then unconsciousness. Given the manner in which this eight-year old endured the final minutes of her life, certainly a rational juror could infer from the above evidence that the victim was subjected to torture and that the murder involved serious physical abuse beyond that necessary to produce death. See Cauthern, 967 S.W.2d at 733-34 (holding evidence sufficient of (i)(5) aggravator when victim was unconscious thirty seconds into attack); State v. Shepherd, 902 S.W.2d 895 (Tenn. 1995) (holding evidence sufficient of (i)(5) aggravator where victim died of asphyxiation and suffocation); Caughron, 855 S.W.2d at 543-44 (evidence sufficient to support (i)(5) aggravator where defendant beat, attempted to rape, and strangled victim); State v. Johnson, 743 S.W.2d 154 (Tenn. 1987), cert. denied, 485 U.S. 994, 108 S.Ct. 1303 (1988) (evidence sufficient for (i)(5) aggravator where victim died from suffocation four

15

minutes into attack). Accordingly, we conclude that there is sufficient evidence from which a rational juror could find this aggravating circumstance beyond a reasonable doubt. This issue is without merit.

## IV. Heinous, Atrocious, or Cruel Jury Instruction

In his initial challenge to the (i)(5) jury instruction, the appellant claims it denied his constitutional right to a unanimous jury verdict. The trial court instructed the jury as follows:

> [T]he murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death.

The appellant asserts that because the instruction was given in the "disjunctive" in that the jury could find "torture" or "physical abuse," then there is no way to determine if all twelve jurors unanimously agreed on the facts to support or its basis for finding this aggravating circumstance. The appellant mistakenly relies upon State v. Shelton, 851 S.W.2d 134 (Tenn. 1993) and State v. Brown, 823 S.W.2d 576 (Tenn. Crim. App. 1991) to support his contention. However, as the State asserts, both *Shelton* and *Brown* involved separate criminal actions on separate dates and not one continuous criminal occurrence as in the instant case.

> Additionally, the trial court instructed the jury,

> Tennessee law provides that no death penalties shall be imposed by a jury but upon a unanimous finding that the State has proven beyond a reasonable doubt the existence of one or more of the statutory aggravating circumstances. . .

And each of the jurors signed the unanimous verdict indicating their approval of both aggravating factors. We conclude that the trial court properly instructed the jury under the law as to the aggravating circumstance. See T.P.I. § 7.04(a) (4th ed. 1995); Tenn. Code Ann. § 39-13-204(i)(5). Therefore, no supplementary instructions were necessary in this case, nor was the appellant's constitutional right to a unanimous jury verdict abridged. This issue is without merit.

16

Second, the appellant asserts that the jury instruction of the (i)(5) aggravating circumstance fails to narrow the class of persons eligible for the death penalty in that the instruction fails to contain a specific intent to torture or to inflict serious bodily injury. In support of his contention, he cites Wade v. Calderon, 29 F.3d 1312 (9th Cir. 1994). The State contends that the issue is waived because the appellant failed to request a specific instruction requiring specific intent to the trial court, and also for the appellant's failure to raise this issue within its motion for a new sentencing hearing under Tenn. R. App. P. 36(a) and Tenn. R. App. P. 3(e). Notwithstanding waiver of this issue, due to the qualitative differences between death and other sentences, the appellate courts of this state consider issues occurring during the sentencing hearing in a capital case. See State v. Bigbee, 885 S.W.2d 797, 805 (Tenn. 1994); State v. Duncan, 698 S.W.2d 63, 67-68 (Tenn. 1985), cert. denied, 475 U.S. 1031, 106 S.Ct. 1240 (1986). Thus, we elect to consider the issue on the merits.

The Tennessee Supreme Court has held that the language of Tenn. Code Ann. § 39-13-204 (i)(5) is sufficient to narrow the class of those offenders eligible for the death penalty. Odom, 928 S.W.2d at 26. Moreover, the supreme court has held that the defendant's intent in causing the torture was irrelevant under this aggravating circumstance. Blanton, 975 S.W.2d at 281; see also Odom, 928 S.W.2d at 25 n. 5 (declining to extend specific intent to serious physical abuse prong). Accordingly, this issue is without merit.

### V. Special Request Instructions

The appellant contends that the jury instruction regarding the (i)(5) aggravating circumstance should require a two-step process. The appellant made an oral special request for such an instruction correcting the language of the statute at the sentencing hearing. The trial court instructed the jury as follows, "the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond

17

that necessary to produce death." (Emphasis added). The appellant asserts that the instruction should read as follows, "the murder was especially heinous, atrocious, or cruel and that it involved torture or serious physical abuse beyond that necessary to produce death." (Emphasis added).[7]

As stated previously, the Tennessee Supreme Court has held this particular aggravator sufficient to narrow the class of death eligible defendants, see Odom, 928 S.W.2d at 26. Moreover, the trial court charged the jury on the applicable law, therefore the court's refusal to give the special request is not error. State v. Story, 608 S.W.2d 599, 603 (Tenn. Crim. App. 1980). This issue is without merit.

Next, the appellant contends that the trial court erred by failing to charge a separate special request instruction regarding circumstantial evidence. Thus, he argues this failure resulted in a violation of state law, due process, equal protection, and "heightened reliability requirements" under the Sixth, Fourteenth, and Eighth Amendments to the United States Constitution respectively. The trial judge instructed the jury as follows that:

> [a]ny fact required to be proved may be established by direct evidence, by circumstantial evidence, or by both combined. Direct evidence is defined as evidence which proves the existence of the fact in issue without inference or presumption. Direct evidence may consist of testimony of a person who has perceived by the means of his or her senses the existence of a fact sought to be proved or disproved. Circumstantial evidence consists of proof of collateral facts and circumstances which do not directly prove the fact in issue but from which that fact may be logically inferred.

Because the appellant pled guilty to the charge of first-degree murder in perpetration of a rape, the appellant requested the following special instruction be

---

[7]First, the State contends the appellant has waived this issue based upon Tenn. R. Crim. P. 30 because the appellant failed to file a written copy of the special request citing State v. Mackey, 638 S.W.2d 830, 836 (Tenn. Crim. App. 1982). However, appellant's counsel did file a motion in limine prior to trial requesting this special instruction. Second, the State claims the appellant has waived this issue under Tenn. R. App. P. 3(e) for its failure to specifically state the issue within its motion for a new sentencing hearing. Certainly, the appellant could have been more specific stating his issue with more particularity; however, the argument at the trial level and at the motion for the new sentencing hearing under this heading addressed this distinct issue.

charged:

> When evidence of a fact required to be proved is made up entirely of circumstantial evidence, then before you would be justified in finding the fact required to be proved, you must find that all of the essential facts are consistent with the finding of the fact required to be proved, and the facts must exclude every other reasonable theory except that of the fact required to be proved.

The appellant claims the special request instruction is simply a modified version of the optional supplemental language provision of T.P.I. Crim. 42.03 (4th ed. 1995), omitting any reference to innocence or guilt in an effort to comply with the sentencing phase. Although the appellant concedes that the evidence in support of the "heinous, atrocious, or cruel" aggravator consisted of both direct and circumstantial evidence, he contends that the evidence in support of the "torture prong" was entirely circumstantial thereby justifying the special request "alternative instruction" citing State v. Thompson, 519 S.W.2d 789 (1975).

However, in the appellant's brief, he ignored the direct evidence from the appellant's own admissions from which the jury could have found "torture." See Monts v. State, 379 S.W.2d 34, 40 (Tenn. 1964) (holding defendant's confession to crime as direct evidence). A case is not based solely upon circumstantial evidence simply because the jury had to reach their decision drawing inferences from direct evidence established by the facts of the case. See State v. Curtis, 1987 WL 26370 (Tenn. Crim. App. at Jackson, Dec. 9, 1987), perm. to appeal granted on other grounds, (Tenn. April 4, 1988). At oral argument, the appellant conceded that there was direct evidence from which the jury could have found "torture;" however, he argued that the jury could have disregarded the direct evidence and been left with solely circumstantial evidence. Therefore, he argues under Thompson, that since both direct and circumstantial evidence existed and the request was made, the trial court's failure to instruct the jury regarding the weighing of circumstantial evidence constitutes reversible error.

Initially, we note it is the duty of the trial court to give a complete charge of the

19

law germane to the facts of the case. Thompson, 519 S.W.2d 789, 792 (Tenn. 1975). When the evidence in the case is entirely circumstantial, the trial court must instruct the jury regarding the law of weighing circumstantial evidence even without a request for that instruction or reversible error is committed. Id. However, when the evidence consists of both direct and circumstantial evidence, such an instruction must only be given if the defendant makes a request; without that request, no error is committed. Id. (citing Monts, 379 S.W.2d at 40).

In the case *sub judice*, we conclude that the evidence regarding "torture" was both direct and circumstantial. The court erred in failing to instruct the jury on weighing circumstantial evidence as requested. See Thompson, 519 S.W.2d at 792. Nonetheless, we hold this error to be harmless. In Deal v. State, 541 S.W.2d 807 (Tenn. Crim. App.), cert. denied, (Tenn. 1976), the trial court failed to charge the requested circumstantial evidence instruction and citing *Thompson* held the error harmless. This court recited as follows:

> Under the facts here, however, where the plaintiff-in-error, through testimony, inculpates himself in the burglary, we find the error to be harmless. The deducible fact to have been determined by the secondary facts was his participation. This was conveniently made directly evident by his testimony. The only element left for the jury was his intent under these facts. To have given the charge would not have been of any necessary aid to the jury in evaluating the evidence in view of the testimony as given by the plaintiff-in-error. Deal, 541 S.W.2d at 808 (citation omitted).

We conclude that from the appellant's own admissions the jury could have clearly inferred acts of "torture" upon the victim thereby rendering this instruction of minimal assistance to the jury in determining the validity of this aggravator. Finding the error to be harmless, this issue is without merit.

## VI. Sympathy Instruction

The appellant challenges the trial court's denial of the appellant's motion to instruct the jury that it could consider sympathy as established by the proof as a

20

mitigating circumstance citing Parks v. Brown, 860 F.2d 1545 (10th Cir. 1988). He cites

no authority from this state on this issue. In addition, he asserts that the combined anti-

sympathy charge[8] given by the judge in combination with this denial was a violation of

the Eighth Amendment by limiting his mitigation evidence.

This very issue was rejected in the appellant's first direct appeal. See Keen, 926

S.W.2d at 739 (citing California v. Brown, 479 U.S. 538, 107 S.Ct. 837 (1987)); Saffle

v. Parks, 494 U.S. 484, 110 S.Ct. 1257 (1990); Boyd, 797 S.W.2d at 598. We conclude

the trial court properly instructed the jury that it could not consider sympathy. This

issue is without merit.

## VII. Batson Challenges

The appellant contends that the State excluded four African-American jurors[9]

with its peremptory challenges in violation of Article I, Section 8 of the Tennessee

Constitution and the Fourteenth Amendment to the United States Constitution. Under

the authority of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712 (1986), he urges

reversal of the sentence. The appellant challenges the dismissal of Jurors McVay,

Humphreys, Wilkes, and Houston.

To invoke the protections of *Batson*, the defendant must establish a prima facie

case that a juror is being challenged on the basis of race or gender. Batson, 476 U.S.

at 94, 106 S.Ct. at 1721; Purkett v. Elem, 514 U.S. 765, 767, 115 S.Ct. 1769, 1770-71

(1995); State v. Jones, 789 S.W.2d 545, 548 (Tenn. 1990). Once the defendant has

presented a prima facie case, the trial court shall require the State to give a race-

---

[8]"You should in no case allow mere sympathy or prejudice solely to influence your verdict but should look to the law and all the facts and circumstances proven in the evidence to determine the verdict."

[9]As the State points out, the appellant only challenges the dismissal of three jurors in his motion for a new trial. Although the challenge to the fourth juror has been waived, this Court opts to consider this juror because of the qualitative difference between a death penalty sentence and other sentences. See Bigbee, 885 S.W.2d at 805.

21

neutral reason for the challenge. Batson, 476 U.S. at 94, 106 S.Ct. at 1721; Purkett, 514 U.S. at 767, 115 S.Ct. at 1770-71. See also State v. Bell, 759 S.W.2d 651, 653. "The race or gender neutral explanation need not be persuasive, or even plausible . . . . Unless a discriminatory intent is inherent in the [proponent's] explanation, the reason offered will be deemed race neutral." Purkett, 514 U.S. at 767, 115 S.Ct. at 1770-71. If a race or gender neutral explanation is given, the court must then determine, given all the circumstances, whether the defendant has established purposeful discrimination. Batson, 476 U.S. at 96-98, 106 S.Ct. at 1723-24; see also Purkett, 514 U.S. at 767, 115 S.Ct. at 1770-71. Although a trial court must accept a facially race-neutral explanation for purposes of determining whether the proponent has satisfied his burden of production, this does not mean that the Court is bound to believe the explanation in making its determination. In other words, while the court may find that a proffered explanation is race-neutral, the court is not required, in the final analysis, to find that the proffered explanation was the actual reason for striking the juror. If the court determines that a race or gender based motive was behind the challenge, the juror may not be excluded. Woodson v. Porter Brown Limestone Co., Inc., 916 S.W.2d 896, 903 (1996).

In making its determination, the trial court must look to the totality of the circumstances for rarely will a party admit that its purpose in striking the juror was discriminatory. Accordingly, the trial court may infer discriminatory intent from circumstantial evidence. "The factfinder's disbelief of the reasons put forth by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of a prima facie case, suffice to show intentional discrimination, and . . . no additional proof of discrimination is required." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749 (1993). Additionally, the court may consider whether similarly situated members of another race were seated on the jury or whether the race-neutral explanation proffered by the strikes' proponent is so implausible or fantastic that it renders the explanation pretextual. The trial court

may also consider the demeanor of the attorney who exercises the challenge which is often the best evidence of the credibility of his proffered explanations. See Hernandez v. New York, 500 U.S. 352, 365, 111 S.Ct. 1859, 1868-69 (1991).

Because a trial record alone cannot provide a legitimate basis from which to substitute an appellate court opinion for a trial court's findings, the trial court must carefully articulate its findings on the record. The trial court has the opportunity to both visually and auditorially observe the demeanor of both prospective jurors and counsel, and accordingly, evaluate their credibility. See State v. Smith, 893 S.W.2d 908, 914 (Tenn. 1994), cert. denied, 516 U.S. 829, 116 S.Ct. 99 (1995) (citing State v. Ellison, 841 S.W.2d 824, 827 (Tenn. 1992)). On appeal, the trial court's findings are to be accorded great deference and are not to be set aside by this court unless clearly erroneous. See Woodson, 916 S.W.2d at 906 (citing In re A.D.E., 880 S.W.2d 241, 243 (Tex. App. 1994); Smith, 893 S.W.2d at 914.

In the present case, in a hearing outside the presence of the jury, the trial court found that defense counsel had not demonstrated a pattern of discrimination; however, the court had the State place their reasons into the record. With regard to Juror McVay, the State challenged her because of her initial reservations about the death penalty. Juror Humphreys was challenged because of her relationship with defense counsel and her concern for the care of her child and mother. Juror Wilkes was challenged because he smiled and laughed inappropriately when asked about the factors used in determining whether to impose the death penalty. He also stated that he would "rather be out roofing."

Concerning Juror Houston, the appellant contends that the State's reason for exercising its challenge was simply unfounded.[10] The State contends that Juror

---

[10]We note, at this juncture, that the record reflects two jurors named Houston. The appellant does not specifically indicate which Juror Houston he is challenging. In his brief, it appears that he is challenging the first Juror Houston. However, the State refers to the second Juror Houston when exercising its peremptory challenge. The record reflects that the challenged

Houston was uncertain in her response to impose the death penalty. Moreover, the State felt she was garrulous and would be an irritant in the jury room. The trial court did not "find any basis for any gender or race problems in the *Batson* matter and will overrule your objection." (Italics added). We agree with the trial court that the appellant has failed to establish a prima facie case of purposeful discrimination. In addition, the record reflects the trial court's finding that the proffered reasons for the peremptory strikes were not racially motivated and the trial court's finding was not clearly erroneous. Thus, this issue is without merit.

## VIII. Individual Voir Dire

Due to the trial court's denial of individual voir dire, the appellant contends that his right to an impartial jury and due process were violated as guaranteed by the Sixth and Fourteenth Amendment of the United States Constitution because it impaired his right to use his peremptory challenges. The State contends the trial court acted appropriately.

The ultimate goal of voir dire is to insure that jurors are competent, unbiased, and impartial. Cazes, 875 S.W.2d at 262; State v. Howell, 868 S.W.2d 238, 247 (Tenn. 1993), cert. denied, 510 U.S. 1215, 114 S.Ct. 1339 (1994). "Individual voir dire is mandated only when there is a 'significant possibility' that a juror has been exposed to potentially prejudicial material." Harris, 839 S.W.2d at 65 (citing Porterfield, 746 S.W.2d at 447); Howell, 868 S.W.2d at 247. Here, the appellant does not allege the presence of any potentially prejudicial material. There is no support in the record of prejudice regarding group voir dire of the jurors' views of the death penalty. See Harris, 839 S.W.2d at 65; Cazes, 875 S.W.2d at 262. The Tennessee Supreme Court has repeatedly held that death qualification of jurors is not required to be conducted by individual, sequestered voir dire. See State v. Stephenson, 878 S.W.2d 530, 540

juror was Rosie Houston.

24

(Tenn. 1994) (citing Smith, 857 S.W.2d at 19). The decision of the trial court denying individual voir dire of the venire remains within the sound discretion of the court, and will not be reversed by this Court absent a finding of "manifest error." Howell, 868 S.W.2d at 247-248.

The appellant filed a pre-trial motion requesting individual voir dire for pre-trial publicity and the juror's views on the death penalty. The motion was renewed before the beginning of the proceedings. The trial court denied the motion; however, the appellant concedes, that if necessary, the court would have allowed questioning at the bench. The appellant has failed to demonstrate any prejudice resulting from the trial court's decision. Therefore, we conclude that the trial court did not abuse its discretion in denying the motion for individual voir dire. This issue is without merit.

In addition, the appellant contends that his equal protection rights under the Fourteenth Amendment to the United States Constitution were violated because individual voir dire is granted routinely in counties other than Shelby County.
The State contends this issue was waived pursuant to Tenn. Ct. Crim. App. R 10(b) because the appellant's brief and the record contain no evidence of these allegations. To prevail upon a claim of an equal protection violation, the appellant bears the burden of proving "the existence of purposeful discrimination. . ." and that such discrimination had "a discriminatory effect on him." Irick, 762 S.W.2d at 129 (citing McCleskey, 481 U.S. at 279, 107 S.Ct. at 1766; see also Keen, 926 S.W.2d at 739. Here, the appellant has failed to carry the burden imposed upon him. For the above stated reasons, this issue is meritless.

## IX. Introduction of Photographs

The appellant contends that the trial court erred by allowing the State to introduce, over objection, two photographs of the victim, one taken before her death

25

and the other a postmortem photograph, because the probative value was substantially outweighed by the unfair prejudice. The first picture was identified by the victim's grandfather which the court introduced solely for identification purposes. Thereafter, Officer Wilson identified the victim in the picture as the same person that was discovered in the Wolf River. The trial court admitted the picture into evidence finding the picture relevant to the identity of the victim and to the nature of the crime.

Through the testimony of Dr. Francisco, the State introduced a postmortem photograph of the victim. The picture corroborated the medical examiner's testimony of the cause of death and method of strangulation. The trial court admitted this picture into evidence based upon its relevance to the heinous, atrocious, or cruel aggravator and the other circumstances of the murder.

The appellant argues that the pictures should have been excluded because identity and the cause of death were uncontested issues. Moreover, he argues that the evidence of the second photograph was inflammatory and cumulative of the medical examiner's testimony.

Tennessee courts have followed a policy of liberality in the admission of photographs in both civil and criminal cases. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). "The admissibility of photographs lies within the discretion of the trial court." Id. The court's "ruling, in this respect, will not be overturned on appeal except upon a clear showing of an abuse of discretion." Id. (citations omitted); see also Stephenson, 878 S.W.2d at 542; State v. Bordis, 905 S.W.2d 214, 226 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1995). However, before a photograph may be admitted into evidence, it must be relevant to an issue that the jury must decide and the probative value of the photograph must outweigh any prejudicial effect that it may have upon the trier of fact. State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1993) (citation omitted); see also Tenn. R. Evid. 401 and 403.

26

The record indicates that the first photograph was offered by the State to establish the victim's identity. We agree with the appellant that the identity of the victim was not at issue at the appellant's resentencing hearing; and, therefore, we find that this photograph was irrelevant[11]. However, we conclude that its admission, although erroneous, was without prejudicial impact upon the jury and constitutes harmless error. See Tenn. R. Crim. P. 52(a).

With regard to the postmortem photograph, our supreme court has held that photographs may be introduced in order to illustrate testimony. Stephenson, 878 S.W.2d at 542. Moreover, the decision to admit or limit cumulative evidence rests within the sound discretion of the trial court. State v. Brown, 836 S.W.2d 530, 553 (Tenn. 1992) (photographs of victim's body admissible despite oral testimony "graphically" describing victim's injuries). See also State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993), cert. denied, 511 U.S. 1046, 114 S.Ct. 1577 (1994) (color photographs of deceased victims at scene of crime were admissible despite introduction of extensive color videotape showing victims' bodies as they were found). In any event, a relevant photograph is not rendered inadmissible merely because it is cumulative. Bigbee, 885 S.W.2d at 807; Van Tran, 864 S.W.2d at 477. See Smith, 893 S.W.2d at 924 (photographs of victim appropriately admitted for establishing "heinous, atrocious, cruel" aggravating factor).

All photographs of dead bodies, especially those involving death by a criminal agency, are disturbing to the average person. After viewing the postmortem photograph, we find nothing particularly gruesome in its nature beyond that which is accurately depicted. Here, the photograph was relevant to supplement and clarify the testimony of the medical examiner and the officer in establishing the cause of death,

---

[11]This court has previously held that a photograph of the deceased during her lifetime is admissible at the guilt phase of the trial to establish the corpus delicti in a homicide case when the question involves the subordinate issue of the identity of the deceased named in the indictment. See State v. Nesbit, No. 02S01-9705-CR-00043 (Tenn. Sept. 28, 1998) (for publication), appendix at p. 10.

27

see Stephenson, 878 S.W.2d at 542, and to the show the brutality of the attack and extent of force used against the victim, from which the jury could infer the "heinous, atrocious, or cruel" aggravator. See Brown, 836 S.W.2d at 551; see e.g., Payne, 791 S.W.2d at 19-20; State v. Miller, 771 S.W.2d 401, 403-404 (Tenn. 1989); Porterfield, 746 S.W.2d at 449-450; State v. McNish, 727 S.W.2d 490, 494-495 (Tenn. 1987). We conclude that the probative value of this photograph far outweighed its prejudicial impact. Therefore, this issue is without merit.

## X. Victim's Impact Reference During Closing Argument

The appellant argues that the prosecutor used improper victim impact references during his closing argument to the jury. The State contends that since appellant's counsel offered testimony for the impact upon the appellant's family asking the jury to spare his life, the prosecutor's comment on the evidence was not inappropriate because it merely showed that the victim's family had also suffered.

The trial court excluded victim impact evidence as irrelevant in the case-in-chief and rebuttal, but allowed the State to argue inferences of proof in their closing argument. The contested portion of the argument is:

> The defendant's family asks you to spare the defendant's life. Don't you think that Nicki Reed's family would have given anything they had to be out on that boat dock begging this defendant not to kill Nicki? Don't you think they would give anything they had not to have to go to bed at night knowing that their little eight-year old baby died at the bottom of the Wolf River, naked, violated, cold and alone? Don't you think, ladies and gentlemen, they would give anything they had to be able to say -- to tuck little Nicki in bed at night and say, honey, that monster wasn't real.

Specifically, the appellant contends this argument was improper because only evidence relating to the aggravating or mitigating circumstances is relevant in a sentencing hearing, and therefore "argument about irrelevant matters is improper" citing Cozzolino v. State, 584 S.W.2d 765, 768 (Tenn. 1979). Additionally, he states that this "inflammatory argument" caused the jury to impose the death penalty in an "arbitrary

28

and capricious manner" thereby diminishing his rights under the Eighth Amendment with an emotional appeal.

There exists no *per se* bar under the Eighth Amendment to the admissibility of victim's impact evidence. Nesbit, No. 02S01-9705-CR-00043; Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597 (1991); Bigbee, 885 S.W.2d at 811-812. Thus, the appellant's constitutional challenge is excluded. As to the appellant's challenge under our sentencing scheme, our supreme court recently observed, "the impact of the crime on the victim's immediate family is one of those myriad factors encompassed within the statutory language *nature and circumstances of the crime*." Nesbit, No. 02S01-9705-CR-00043; see Tenn. Code Ann. § 39-13-204(c). This holding in *Nesbit* permits only that victim impact evidence which is not so prejudicial "that it renders the trial fundamentally unfair," Nesbit, No. 02S01-9705-CR-00043 (citing Payne, 501 U.S. at 825, 111 S.Ct. at 2608) or that which should be excluded under Tenn. R. Evid. 403. As well, prosecutorial argument of victim impact evidence must be exercised with restraint. Nesbit, No. 02S01-9705-CR-00043 ("inflammatory rhetoric that divert the jury's attention from its proper role or invites an irrational, purely emotional response to the evidence is not permissible and should not be tolerated by the court.").

In order to determine whether the prosecutor's comment requires reversal, we must determine whether the argument "affected the verdict to the prejudice of the defendant." Bigbee, 885 S.W.2d at 809 (quoting Harrington v. State, 215 Tenn. 338, 385 S.W.2d 758, 759 (1965)). Our supreme court has outlined the following factors for us to consider:

> (1) the conduct complained of viewed in light of the facts and circumstances of the case:
>
> (2) the curative measures undertaken by the court and the prosecution;
>
> (3) the intent of the prosecutor in making the improper arguments;
>
> (4) the cumulative effect of the improper conduct and any other errors in the record; and

29

(5) the relative strength and weakness of the case.

Nesbit, No. 02S01-9705-CR-00043.

We conclude that the State did not over emphasize the victim impact evidence in its closing argument. Nothing in the record indicates that the prosecutor acted in bad faith. Even though the trial court allowed the prosecutor to argue victim's impact inferences from the evidence, the trial court instructed the jury,

> the court has read to you the aggravating circumstances which the law requires you to consider if you find that they have been established by the evidence beyond a reasonable doubt. You shall not take account of any other aggravating facts or circumstances as the basis for deciding whether the death penalty would be appropriate punishment in this case.

The jury was instructed not to consider victim impact evidence to determine whether or not to impose the death penalty. It is well settled in the state of Tennessee that a jury is presumed to have followed a trial court's instructions. State v. Lawson, 695 S.W.2d 202, 204 (Tenn. Crim. App. 1985); State v. Blackmon, 701 S.W.2d 228, 233 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1985). In light of the strong evidence against the appellant in support of the aggravating factors, we believe the prosecutor's comment in no manner affected the verdict rendered by the jury. Therefore, this issue is without merit.

## XI. Constitutionality of the Death Penalty

The appellant concedes that the constitutionality of the death penalty has been upheld by the Tennessee Supreme Court, however, he raises the following issues in order to preserve them for later review. The appellant contends that (1) the death penalty statute fails to meaningfully narrow the class of eligible defendants[12]; (2) the prosecution has unlimited discretion in seeking the death penalty; (3) the death penalty is imposed in a discriminatory manner based upon economics, race, geography, and

---

[12]Within this issue the appellant challenges Tenn. Code Ann. § 39-13-204(i)(4), (i)(5), (i)(6), and (i)(7). In this case, the State only relied upon Tenn. Code Ann. § 39-13-204(i)(2) and (i)(5). Therefore, the appellant is without standing to challenge (i)(4), (i)(6), and (i)(7). The constitutionality of (i)(5) is addressed previously in this opinion.

30

sex; (4) there are no uniform standards for jury selection; (5) juries tend to be prone to returning guilty verdicts; (6) the defendant is denied the opportunity to address the jury's popular misconceptions about parole eligibility, cost of incarceration, deterrence, and method of execution; (7) the jury is instructed it must unanimously agree to a life sentence, and is prevented from being told the effect of a non-unanimous verdict; (8) courts fail to instruct the juries on the meaning and function of mitigating circumstances; (9) the jury is deprived of making the final decision about the death penalty; (10) the defendant is denied the final argument during the sentencing phase; (11) electrocution is cruel and unusual punishment; and (12) the appellate review process in death penalty cases is constitutionally inadequate.

These issues have repeatedly been rejected by our supreme court. See Smith, 893 S.W.2d at 908; Brimmer, 876 S.W.2d at 75; Cazes, 875 S.W.2d at 253; Smith, 857 S.W.2d at 1; Black, 815 S.W.2d at 166; Boyd, 797 S.W.2d 589; State v. Teel, 793 S.W.2d 236 (Tenn. 1990); Thompson, 768 S.W.2d at 239. See also Keen, 926 S.W.2d at 741-44.

## XII. Proportionality Review

Although the appellant makes no argument regarding the proportionality of his sentence to those imposed in similar cases in his brief[13], this court is required by Tenn. Code Ann. § 39-13-206(c)(1)(D) (Supp. 1996) and under the mandates of State v. Bland, 958 S.W.2d 651, 661-674 (Tenn. 1997), cert. denied, -- U.S. --, 118 S.Ct. 1536 (1998), to conduct such a review.

---

[13]We note that this offense occurred prior to the supreme court's decision in *Bland*, however, we believe the supreme court's dictate in *Bland* that all parties address proportionality review in their briefs applies to all appeals following this decision, including the appeal of this resentencing hearing.

> To assist this Court in fulfilling our statutory duty, the State and the **defendant** in each case **must** fully brief the issue by specifically identifying those similar cases relevant to the comparative proportionality inquiry. Bland, 958 S.W.2d at 667 (emphasis added).

At oral argument, appellate counsel stated that he deemed it unnecessary to address proportionality review because the supreme court on direct appeal had previously found imposition of the death penalty in this case proportionate. See Keen, 926 S.W.2d at 743-744.

Our review begins with the presumption that the sentence of death is not disproportionate to the crime of first-degree murder, State v. Mann, 959 S.W.2d 503, 513 (Tenn. 1997), cert. denied, -- U.S. --, 118 S.Ct. 2376 (1998); while the objective of this review is to prevent the death penalty from being imposed by the jury in an arbitrary and capricious fashion. Bland, 958 S.W.2d at 665. As the supreme court has stated in Cazes, 875 S.W.2d at 270, and more recently in Bland, 958 S.W.2d at 665, this review is "not a rigid, objective test." This court may consider cases in which different aggravating circumstances were found applicable by the jury, and we do not "employ a mathematical formula or scientific grid." Brimmer, 876 S.W.2d at 84. "[T]he sentence of death is not disproportionate, unless, the case taken as a whole is plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." Bland, 958 S.W.2d at 668.

Under the guidelines of *Bland*, this court is to consider the following factors under the first portion of its review:

(1) the means of death; (2) the manner of death (e.g., violent, tortuous, etc.); (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victim's circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on nondecent victims. Bland, 958 S.W.2d at 667.

In the case *sub judice*, the means of death was ligature strangulation, or as the medical examiner postulated, possibly drowning. As previously stated in this opinion, the victim's death was tortuous both mentally and physically as an eight-year old was taken to a remote, desolate location; raped until she defecated; manually strangled; strangled with a shoestring; and thrown into the river. The victim was taken from her home by the appellant whom she and her mother had trusted for her care. There is no apparent motive for the killing. Evidence was presented from which a jury could have inferred premeditation from the appellant's act of removing a shoestring from his shoe at the mobile home and his possession of the shoestring when he drove his victim to

the river.  There is no evidence of justification or provocation.  This was a senseless murder of an innocent victim.

> Regarding the particular defendant, we must consider, although not exclusively:
>
> (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional, or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with the authorities; (6) the defendant's remorse; (7) the defendant's knowledge of helplessness of victim(s); and (8) the defendant's capacity for rehabilitation.  Bland, 958 S.W.2d at 667.

Although the appellant, twenty-seven at the time of the offense, had no prior criminal record as an adult, his home life after the age of four was a stable, loving environment.  Prior to that time, the appellant, his brother, and sisters suffered from an impoverished, abusive environment at the hands of the appellant's father.  Subsequently, his father and mother abandoned them, and the children were sent to foster homes.  The other mitigating evidence offered on his behalf from his family were occurrences that the appellant did not witness or for which he was not involved.  With regard to his mental health, there was equivocal evidence of the appellant's testing scores that he was "faking bad," i.e., manipulating the evaluations.  However, Dr. Ciocca diagnosed that the appellant demonstrated severe depression, personality problems, post-traumatic stress disorder, pedophilia, and attention deficit disorder.  The appellant did assist the officers in finding the body of the victim, but he  offered no remorse other than that of pleading guilty.  The appellant abused his position of trust with the victim, and he was aware of her young age.  Nothing in the record indicates the appellant's capacity for rehabilitation.

First, we recognize that no two cases or defendants are identical.  However, by comparing the precedent of similar cases and defendants, we conclude that the death penalty in this case is neither arbitrary nor disproportionate.

> 1.  State v. Coe, 655 S.W.2d 903 (Tenn. 1983), cert. denied, 464 U.S. 1063, 104 S.Ct. 745 (1984) (imposing death penalty based upon (i)(1),

33

(i)(5), (i)(6), and (i)(7) aggravating circumstances where eight-year old victim was taken to deserted area fondled, raped, manually strangled, stabbed, and left in field; defendant presented dysfunctional family history, including sexual abuse of siblings committed by father in defendant's presence; defendant was previously institutionalized for mental problems);

2.  State v. Teel, 793 S.W.2d 236 (Tenn.), cert. denied, 498 U.S. 1007, 111 S.Ct. 571 (1990) (imposing death penalty under (i)(5)[14] and (i)(7) aggravating circumstances where victim, fourteen, died of some type of strangulation, no conclusion of rape but spermatozoa found in victim's underpants along with defendant's admission of rape; victim was taken to remote location and knew defendant);

3.  State v. Irick, 762 S.W.2d 121 (Tenn. 1988) (imposing death penalty based upon (i)(1), (i)(5), (i)(6), and (i)(7) aggravating circumstances where seven-year old victim was raped with damage to her vagina and died of asphyxiation and suffocation; defendant was twenty-six years old with no prior criminal history, although he had prior institutionalization for mental treatment, and defendant knew victim);

4.  State v. Hines, 919 S.W.2d 573 (Tenn. 1995) (imposing death penalty based upon (i)(2), (i)(5), and (i)(7) aggravating circumstances where defendant presented proof of troubled childhood, alcoholic mother, abandonment from his parents, abused drugs and alcohol as teenager, self-destructive behavior, paranoid personality disorder, dysthymia, chronic depression, after murdering a hotel maid by stabbing her to death);

5.  State v. Brimmer, 876 S.W.2d 75 (Tenn. 1994) (imposing death penalty based upon (i)(7) aggravating circumstance where defendant murdered victim by manual and ligature strangulation; defendant had psychological impairments from abuse and neglect, borderline personality disorder, emotional withdrawal, intense anger, inability to maintain enduring relationships; other psychologist felt he was exaggerating his mental condition);

6.  State v. Smith, 868 S.W.2d 561 (Tenn. 1993) (imposing three death sentences based upon (i)(5), (i)(6), (i)(7), (i)(12) aggravating circumstances in triple homicide where defendant had been hospitalized for depression, paranoid personality disorder, chronic depressive neurosis, and paranoid delusional disorder, dysfunctional family).

7.  State v. Shepherd, 902 S.W.2d 895 (Tenn. 1995) (imposing death penalty based upon (i)(2), (i)(5), and (i)(7) possible suffocation after being buried alive where sixteen-year old victim was raped and asphyxiated to her death; defendant possessed low IQ (88), impoverished family, emotionally scarred as child, prior admission to mental health facility, treated for depression and anxiety);

8.  State v. House, 743 S.W.2d 141 (Tenn. 1987) (imposing death penalty based upon (i)(2), (i)(5), and (i)(7) aggravating circumstances

---

[14]We note that cases prior to the 1989 Sentencing Act were convicted under the former language of the (i)(5) aggravating circumstance which read, "The murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." Tenn. Code Ann. § 39-2-203(i)(5) (repealed 1995).

where victim was strangled and received blow to the head; defendant was from broken home with suicidal tendencies).

9. State v. Blanton, 975 S.W.2d 269 (Tenn. 1998) (imposing death penalty under (i)(2), (i)(6), and (i)(7) aggravating circumstances for two counts of first-degree murder for defendant with impoverished childhood, alcoholic, abusive father);

10. State v. Cauthern, 967 S.W.2d 727 (Tenn. 1998) (imposing death penalty under (i)(5) aggravating circumstance where victim died of ligature strangulation and victim could have lived three to six minutes, but may have been rendered unconscious in thirty seconds and victim was raped; defendant was 19 years old, never knew his father and was adopted by grandparents).

11. State v. Hodges, 944 S.W.2d 346 (Tenn.), cert. denied, --U.S.--, 118 S.Ct. 567 (1997) (imposing death penalty based on (i)(5) aggravating circumstance suffered by victim of strangulation where defendant exhibited antisocial personality disorder and was raped as a child);

12. State v. Caughron, 855 S.W.2d 526 (Tenn.), cert. denied, 510 U.S. 979, 114 S.Ct. 475 (1993) (death penalty applied to defendant who severely beat and strangled victim);

13. State v. Vann, 976 S.W.2d 93 (Tenn. Sept. 21, 1998), reh'g denied, (Oct. 19, 1998) (imposing death penalty based upon (i)(1), (i)(2), and (i)(5) aggravating circumstances where eight-year old victim was raped and strangled; defendant, father, came from impoverished background, had nervous breakdown, addicted to medication, suffered physical abuse from his father, depression, and suicidal tendencies);

But see State v. Julian, No. 03C01-9511-CV-00371 (Tenn. Crim. App. at Knoxville, July 24, 1997), perm. to appeal denied, (Tenn. Apr. 20,1998) (giving life without parole where death penalty was sought based upon (i)(1) and (i)(5) aggravating circumstance; defendant, 22, was acquainted with victim who was 3 years old, took her to remote location, raped, strangled, and tossed body into underbrush; defendant, however, was under influence of marijuana and alcohol at time of offense; defendant sexually abused by grandfather, alcoholic mother, prior substance abuse, depressive disorder, mixed personality disorder, neglectful mother, dysfunctional family background); Vann, 976 S.W.2d at 108-109 (citing State v. Paul William Ware[15], where twenty-four year old defendant raped and murdered four-year old victim dying from asphyxiation; life without parole imposed although death penalty sought under (i)(1) and (i)(5) aggravating factors; defendant under influence of intoxicants at time of murder); see also Vann, 976 S.W.2d at 109 (citing State v. John Edward Allen, where 17 year old defendant raped and strangled three-year old child; jury found one aggravator (i)(7), although (i)(5) was presented, and imposed life without parole).

In the above cases of *Ware* and *Allen* in which sentences of death were not

[15]This case is presently pending before this Court. Oral argument was heard on October 27, 1998, but at this time, no opinion has been released. The Rule 12 report was discovered after a search through the Rule 12 Report Database.

imposed, the defendant was not acquainted with the victim. Moreover, in the cases of *Julian* and *Ware*, there was evidence presented that at the time of the offense the defendant was under the influence of alcohol or other intoxicants. Although it would appear the appellant has offered substantial mitigation as in these cases, the mitigation was properly rebutted by the prosecution with regards to the psychological testing and evaluations to which the jury could have given little weight. Here, the appellant was in a place of trust with the victim as her caretaker. The cases in which the death penalty has been imposed are strikingly similar.

As stated previously, no two cases are identical in circumstances or defendants, however, as precedent reveals, the death penalty has been imposed in analogous cases involving rapes and strangulation of the victim. Therefore, we conclude that the death penalty is neither arbitrary nor disproportionate as applied in this case. This issue is without merit.

**CONCLUSION**

After an extensive review of the record and the issues before us, as mandated by Tenn. Code Ann. § 39-13-206(b), and (c), and for the reasons stated herein, we affirm the appellant's sentence of death. We conclude that the sentence of death was not imposed in an arbitrary fashion, the evidence supports the jury's finding of the aggravating circumstances, and the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances. Moreover, a comparative proportionality review, considering both the "nature of the crime and the defendant," Tenn. Code Ann. § 39-13-206(c)(1)(D), convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.[16]

---

[16]No execution date is set. Tenn. Code Ann. § 39-13-206(a)(1) provides for automatic review by the Tennessee Supreme Court upon affirmance of the death penalty. If the death sentence is upheld by the higher court on review, the supreme court will set the execution date.

_____
DAVID G. HAYES, Judge


CONCUR:



_____
JOE G. RILEY, Judge



_____
JOHN EVERETT WILLIAMS, Judge



_____

37